404 F.Supp. 643 (1975)
Robert Dean MATTIS, M.D., Plaintiff,
v.
Richard R. SCHNARR, and Robert Marek, Defendants,
v.
John C. DANFORTH, Attorney General, State of Missouri, Intervenor Defendant.
No. 72C 1 (4).
United States District Court, E. D. Missouri, E. D.
October 7, 1975.
*644 Richard D. Baron, Eugene H. Buder, Benjamin Roth, American Civil Liberties Union of Eastern Missouri, St. Louis, Mo., for plaintiff; Joel M. Gora, American Civil Liberties Union, New York City, of counsel.
J. Leonard Walther, Brackman, Copeland, Oetting, Copeland, Walther & Schmidt, Clayton, Mo., for defendants Wm. Kisling & Richard E. Schnarr.
Shulamith Simon, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for defendant Robert Marek.
Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown and F. Douglas, O'Leary, St. Louis, Mo., for defendant.

OPINION
NANGLE, District Judge.
This case is before the Court following a decision by the United States Court of Appeals for the Eighth Circuit, remanding the case for a determination of the constitutionality of the Missouri states involved. Mattis v. Schnarr, et al., 502 F.2d 588 (8th Cir. 1974).[1]
Plaintiff was the father of Michael G. Mattis who has been killed. This suit was originally brought by plaintiff and his wife, Christine H. Mattis, Michael's mother; Mrs. Mattis, however, has died since the institution of this suit. The defendants, Patrolman Richard R. Schnarr and Sergeant Robert Marek, were the arresting officers involved in the death of the plaintiff's son. The Attorney General for the State of Missouri has intervened in this suit following the remand by the Court of Appeals.
The case was submitted on stipulated facts. On November 30, 1971, plaintiff's son, Michael Mattis, age 18, and a Thomas Rolf, age 17, had entered the office of a golf driving range at night by means of an unlocked window for the purpose of taking money. As the two were leaving, they were intercepted by defendant policemen who attempted to effectuate an arrest. Rolf was taken into custody, but Mattis broke away from defendant Marek's grasp. As Mattis fled, Marek shouted, "Stop, or I'll shoot". When Mattis continued his flight, Marek fired one shot, believing he shot in the air above Mattis. The bullet, however, struck Mattis in the head, causing his death. It was stipulated that the defendant police officers would testify
that their use of their guns in the manner described was reasonably necessary under the circumstances and was authorized by the statutes of the State of Missouri and that such statutes were valid and lawful.
Mattis v. Kissling, et al., Civil No. 72-Civ. (3) (E.D.Mo., filed January 16, 1973).
Plaintiff seeks a declaratory judgment that the statutes authorizing the defendant police officers' conduct (Sections 559.040 and 544.190, Revised Statutes of Missouri 1969) are unconstitutional. Plaintiff also asked for damages for the wrongful death of his son but has since abandoned this claim.
Plaintiff contends that the statutes in question 1) violate the Fourteenth Amendment by depriving him of his right to raise a family and by authorizing the termination of his parental rights, without due process of law, 2) violate the equal protection clause of the Fourteenth Amendment because of the distinction made between felons and misdemeanants, and 3) inflict cruel and unusual punishment on plaintiff and his decedent son contrary to the Eighth Amendment.
The two statutes being challenged provide:

*645 1) § 559.040, R.S.Mo.1969:
Homicide shall be deemed justifiable when committed by any person in either of the following cases:
. . . . . .
(3) When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed, or in lawfully suppressing any riot or insurrection, or in lawfully keeping or preserving the peace.
2) § 544.190, R.S.Mo.1969:
If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest.
This latter statute requires that (1) the arresting officer give a defendant notice of his intention to arrest, (2) that the defendant either flee or forcibly resist, and (3) that whatever force the officer uses must be necessary. There is an additional requirement, that the arrest be lawful, which is implicit in the statutes.
Statutes such as the ones under attack here exist in a majority of states, and although criticism has been levelled at the scope of such statutes, most writers on the subject propose amendments and not complete abolition.[2]
Society requires protection against criminals. Criminal laws are enacted in order to give legal form and efficacy to such protection. Enforcement of these laws requires, ultimately, the prosecution of those who violate them. Since arrest of the violator is a condition precedent to this entire enforcement procedure, whatever facilitates arrest benefits society unless there are concomitant consequences which are socially harmful.
Obviously, the right to use deadly force facilitates arrest. Its legalization notifies the criminal that flight invites the risk of injury or death. On the other hand, if injury or death does occur, social injury results. Therefore, the right to use deadly force should be limited.[3]
At the outset it should be noted that it is not the role of this Court to determine whether social policy dictates that the scope of the statutes be narrowed. This Court's duty is to determine whether the challenged statutes are in conflict with the Constitution of the United States. In this determination, plaintiff's three contentions will be considered separately and in order.

I. THE DUE PROCESS ARGUMENT
Plaintiff asserts that the statutes violate his right to raise a family and his right to retain his parental rights until terminated by due process of law.
In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), in a concurring opinion, it is stated that:
The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected. Id. at 495, 85 S.Ct. at 1688.
The right to raise a family had been previously recognized in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L. Ed. 1042 (1923) wherein the state had attempted to forbid the teaching of any foreign language in public school until the child had reached the eighth grade; and in Pierce v. Society of Sisters, 268 *646 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924) where the state had attempted to abolish private schools.
Other cases have held that parental rights may not be terminated without notice and a hearing. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (statute allowing adoption without parental consent, or notice to the parent of the proceedings, upon a showing of insubstantial support by that parent during the preceding two years, held violative of due process); White v. Minter, 330 F.Supp. 1194 (D. Mass.1971) (Welfare Department determination that mother had abandoned her child, without notice and a hearing on that issue, held violative of due process). The Court notes, however, that these cases concern the rights of parents under circumstances in which the termination of the parental relationship is sought because of actions or conduct on the part of the parent; these cases do not concern themselves with termination because of conduct of the child.
The Court further notes that the statutes in question herein do not automatically require the deprivation of plaintiff's parental rights. The statutes did not command that plaintiff's son be killed. The statutes, instead, view such killing as a permissible outside limit on the actions of the arresting officers, provided that certain conditions precedent have been met. The deprivation of plaintiff's parental rights resulted from the actions of plaintiff's son, the consequences of those actions bringing the statutes into play.
In Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), a case involving a claim of disenfranchisement, the court recognized a distinction between those situations in which a statute itself deprives a petitioner from asserting a constitutional right and situations in which a petitioner's own actions caused the resultant deprivation.
Moreover, not every action which can be viewed as an infringement on the right of a parent to raise a child will be held to amount to an invasion of those rights. In Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971), a child was suspended from school because of his hair length. The court refused to recognize any invasion of the parental right to raise a family where the record showed that the parents had merely supported the child's right to determine his own personal appearance and were not responsible for the choice themselves. The court held that the record failed to establish a direct invasion of parental rights and that such an invasion would be necessary. Here, too, plaintiff does not claim that his son's flight was the result of an action taken by plaintiff as the parent. Instead, it was the son's decision alone. If a direct relationship is required before an invasion of parental rights by a school policy will be found, then certainly such a relationship needs to be established where the parent seeks to establish an invasion by a statute.
Constitutional rights are not absolute; where conflict arises between assertions of rights, there must be a balancing of the public interest and the individual's rights. In California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), a claim of self-incrimination was held insufficient to override the state's need for disclosures of names and addresses at the scene of car accidents. In Breard v. Alexandria, 341 U. S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), the constitutional protection of property rights yielded to a city's interest in protecting its citizens from annoyances. And, in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L. Ed. 645 (1943), the court upheld the state's right to prohibit distribution of literature by a minor against a claim of parental rights and religious rights.
Here the claims of parental rights must be weighed against the interest of the state in apprehending criminals and in aiding police officers in the fulfillment of this duty. The dangers faced by the police are not to be minimized. *647 See Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). To restrict the means available to the police to effectuate an arrest is to reduce the effectiveness of the officers in the pursuit of their duties. The present case does not present the situation which existed in Pierce, Meyer, and Prince, supra, in which the state attempted to control an aspect of the child's upbringing in a manner which ran counter to the desires of the parent.
As stated in 14 McGill L.J. at page 311:
If effective law enforcement is to be maintained the race should not be to the swift. The fleeing criminal, regardless of his offense, must be considered as the author of his own misfortune.
The competing interests here involve two different areas of concern; plaintiff asserts a right to raise a family and to have his parental rights continue until terminated by due process of law while the state asserts an interest in aiding police officers in apprehending criminal suspects. While neither assertion of right is to be taken lightly, it is this Court's opinion that plaintiff's claims of parental rights must yield to the state's overriding interest as determined by the legislature. These statutes are not violative of the due process clause of the Fourteenth Amendment.

II. THE EQUAL PROTECTION ARGUMENT
Plaintiff contends that the statutes violate the equal protection clause of the Fourteenth Amendment in that misdemeanors are excluded from the statutes' provisions but are in many cases as serious, if not more so, than some felonies. Plaintiff further argues that application of the statutes to the classification "felony" may have had relevance at one time, but that this relevance has been lost due to the increase in the number of crimes classified as felonies and the reduction in punishments for most felonies.
In Skinner v. Oklahoma, 316 U.S. 527, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Court invalidated on equal protection grounds a statute which authorized the sterilization of persons three times convicted of felonies involving moral turpitude upon a determination that sterilization would not be dangerous to their health. The statute exempted from its coverage certain felonies, the example given by the Court being embezzlement. The Court emphasized that:
if we had here only a question as to a State's classification of crimes, such as embezzlement or larceny, no substantial federal question would be raised. [cite omitted] For a state is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining "its restrictions to those classes of cases where the need is deemed to be clearest". [cite omitted] Id. at 540, 62 S.Ct. at 1113.
The Court's holding that the statute violated the equal protection clause was premised on the fact that no reason existed for excluding certain felonies, such as embezzlement, from the reaches of the statute, coupled with the fact that the science of genetics had not progressed sufficiently to determine that criminal traits were inheritable.
In the present case, however, there is no exclusion of certain felonies from the reaches of the statutes in question. Nor can this Court say that the statutes' applicability to felonies is no longer relevant to the purposes for which the classification is made. To be sure felonies are no longer punishable by death as was the situation at common law. Nonetheless, the legislature has determined that certain crimes pose a more serious threat to the community; it has denominated such crimes to be felonies. It is the legislature's judgment that such crimes warrant more severe treatment than others, and consequently that the need *648 for the apprehension of persons committing such crimes is more urgent for society's benefit.[4]
Plaintiff says that the two statutes in question are arbitrary in their distinction between felonies and misdemeanors. It is hard to conceive of a statute on this subject which will not seem arbitrary to the person arguing against it. There have been scores of suggested substitutes for statutes of this sort. The following are but a few:
1. Model Penal Code, Proposed Official Draft, § 3.07(b) (1962) authorizes the use of deadly force where the arrest is for a felony and the felony involved the use or threatened the use of deadly force, or there is a substantial risk that the person sought to be arrested will cause death or injury if his apprehension is delayed. Accord, Presidential Commission on Law Enforcement and the Administration of Justice.
2. Restatement of Torts § 131 authorized the use of deadly force if the crime normally caused death or serious injury or involved breaking and entering of a dwelling.
3. Restatement (Second) of Torts § 131 follows the felony-misdemeanor distinction.
4. Pearson, The Right to Kill in Making Arrests, 28 Mich.L.Rev. 957 (1930) asserts that the right to use deadly force should depend on the gravity of the crime, regardless of its classification as a felony or misdemeanor.
5. Pearson, Note, 24 Iowa L.Rev. 154 (1938) argues that the dangerousness of the crime is the decisive factor.
6. 14 McGill L.J. 293, supra, concludes that as long as the arrest is lawful and deadly force is used as a last resort, it should be authorized.
7. Plaintiff's own prayer in this case asking this Court to declare
Sections 559.040 and 544.190 of the Revised Statutes of Missouri, insofar as they pertain to the use of deadly force in making an arrest, unconstitutional and void, except insofar as they authorize police officers and others to use or order the use of deadly force against persons seeking to avoid arrest or escaping from arrest when there is reasonable apprehension that such persons will cause death or serious injury to the police officers or others using the deadly force (meaning private citizens making an arrest) or to other persons or members of the public . . .
Each of the above suggested approaches has its element of arbitrariness. In fact, the use of a weapon even in war is a totally arbitrary act.
Plaintiff refers this Court to the position taken by Professor Mikell, quoted in Sauls v. Hutto, 304 F.Supp. 124 (E.D. La.1969) who appears to be of the opinion that officers should be permitted to use deadly force only in effectuating an arrest of a person who has committed a crime punishable by death (hence, never?). "If we are not killing him for stealing the automobile and not killing him for fleeing, what are we killing him for? These two things put together certainly do not admit of the death penalty."
Plaintiff also refers the Court to the Model Penal Code which authorizes the use of deadly force where
(i) the arrest is for a felony . . .; [and]
(iv) the police officer believes that
(1) the crime for which the arrest is made involved conduct including the use or the threatened use of deadly force; or
(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed. Model Penal Code § 307(2)(b).
Both Professor Mikell and the Model Penal Code have, of course, engaged in a legislative determination, in drawing a *649 line as to when deadly force is permissible.
Plaintiff, in his prayer for relief and in his brief, suggests his arbitrary statutory solution for the use of deadly force. Plaintiff concedes that if the danger of the suspect's being at large is great, the suspect must be captured by use of whatever force is necessary. Would plaintiff concede that a murderer at large poses a substantial danger to society? If so, how can that position be reconciled with the fact that, in a large number of cases, murders are once-in-a-lifetime acts committed by persons who knew their victims? Would plaintiff urge that some murderers be excluded  since only a few of them pose any future threat to society?
Plaintiff points out that recently the Missouri legislature has had various bills pending before it seeking to amend the statutes in question but has failed to enact any of them. In fact, the Missouri House of Representatives in June, 1975 rejected an attempt to amend the statutes questioned by plaintiff. Plaintiff indicates impatience with the slowness of the legislative process. This is not, of course, an unfamiliar complaint. Yet, does that justify an edict from a federal court either nullifying these statutes or, as plaintiff requests, redrafting them? In fact, it can be argued that the history of the Missouri legislature in failing to amend these statutes is an affirmation of its legislative determination that the need for protecting society warrants the retention of them in their present form.
The Missouri legislature is not the only group which has struggled with the question of when deadly force may be used. Many learned scholars have written, and disagreed, about what situations justify the use of deadly force.
Some say that the gravity of the offense committed should control. Yet, an argument can be made that there is no evidence that persons who commit "grave" offenses present a greater threat to society than those who commit lesser offenses. And what is a "grave" offense?
Others contend that the test should center on the threat to human life and safety. Probably all would agree that a police officer should be authorized to employ deadly force in order to protect the life or safety of himself, the victim or innocent third parties. But it is difficult to see how he can determine, in a split second, that a fleeing offender is going to pose a threat to the community unless the person fleeing makes some announcement to that effect.
There are numerous other suggested classifications, some of which have been previously referred to in this opinion. All of these alternatives have their supporters  and all suffer from some degree of arbitrariness.
This Court believes that the statutory classification in question here is reasonable and is as free from arbitrariness as any other suggested classification. And it has a firmer basis in precedence.
A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike". [cite omitted] Eisenstadt v. Baird, 405 U.S. 438, 92 S. Ct. 1029, 31 L.Ed.2d 349 (1972).
In Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1971), the Court held that ". . . if there are other, reasonable ways to achieve those [the statutes'] goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference". Id. at 343, 92 S. Ct. at 1003. In Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968), the Court required that a state establish a "compelling interest" in order to sustain the validity of the statute in question because "appellees were exercising a constitutional right". Id. at 634, 89 S.Ct. at 1331. "Only where state action impinges on the exercise of fundamental constitutional rights or *650 liberties must it be found to have chosen the least restrictive alternative." San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 51, 93 S.Ct. 1278, 1306, 36 L.Ed.2d 16 (1972) (emphasis added). The activity herein is not constitutionally protected; there is no constitutional right to flee to prevent arrest. The burden the statutes impose is on flight, not on life. Clearly the state has a compelling interest in the enactment of these statutes.
Perfect statutes are difficult, if not impossible, to draft. To choose among the various imperfect alternatives is a duty delegated to the legislatures and not to the judiciary, unless the alternative chosen be so imperfect as to violate constitutional principles. This Court is of the opinion that such is not the case here. These statutes do not violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.

III. THE CRUEL AND UNUSUAL PUNISHMENT ARGUMENT
Plaintiff also contends that the statutes violate the Eighth Amendment's prohibition against cruel and unusual punishment. That phrase has never been precisely defined for the reason that its meaning has been held not to be static but to change through the years. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). In Cunningham v. Ellington, 323 F.Supp. 1072 (W.D Tenn.1971) a case challenging Tennessee statutes identical to the statutes herein, the Court rejected the Eighth Amendment argument, holding that the actions of the officers were simply not punishment. Id. at 1075. But assuming that the conduct is to be considered punishment, Howell v. Cataldi, 464 F.2d 272 (3rd Cir. 1972), the Court is of the opinion that plaintiff's position cannot be sustained. In Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) the Court stated that "the Amendment stands to assure that this power [to punish] be exercised within the limits of civilized standards". Id. at 100, 78 S.Ct. at 597. Involved was a statute providing for loss of nationality if a member of the armed forces deserted during war time. The Court looked to the practices of the other civilized nations of the world and found "virtual unanimity that statelessness is not to be imposed as punishment for a crime". Id. at 102, 78 S.Ct. at 599. See also McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), a due process case, in which the Court surveyed the practice of the states to determine whether the practice under question "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental". Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Thirty-four states authorize the use of force sought to be condemned herein.[5] Such support for these *651 statutes would surely give credence to the proposition that the limits of civilized standards have not been exceeded. This Court so holds.
Again the Court notes that any classification which would allow deadly force to be used against persons who have committed certain specified crimes, and not against other offenders would inevitably be subject to the same attack as plaintiff wages here. To abolish the use of deadly force altogether is to deprive the state and its citizens of their rights to security, safety and a feeling of protection. To pick and choose those crimes warranting the application of these statutes is the duty of the legislature. It involves a determination of the effect and seriousness of crimes on society and such a determination lies exclusively within the province of the legislative branch. It is not the role of a federal judge to legislate for the people of a state.
This Court, or any court, must have only sympathy for the plaintiff's son or for any other person, young or old, who is injured or killed while fleeing from capture. Likewise, a court must have sympathy for victims of crimes. Yet, a court's sympathies cannot be the basis for its judgments. This Court will not, under the guise of constitutional pronouncements, arrogate unto itself the power to amend or nullify the statutes in question.
Tested by the requirements of the Constitution of the United States, the statutes here challenged by plaintiff are valid and should not be voided, or amended, by this Court. Accordingly, plaintiff's complaint will be dismissed.
NOTES
[1] The original district court opinion, Mattis v. Kissling, et al., Civil No. 72-Civ.(3) (E. D.Mo. January 16, 1973), was prepared by the Hon. William H. Webster, now Circuit Judge for the United States Court of Appeals for the Eighth Circuit.
[2] See, Justification for the Use of Force in the Criminal Law, 13 Stanford L.Rev. 566 (1961); The Use of Deadly Force in the Apprehension of Fugitives from Arrest, 14 McGill L.J. 293 (1968); Casenote, 17 Loyola L.Rev. 470 (1970-71); Use of Deadly Force in the Arrest Process, 31 La.L.Rev. 131 (1970); Policeman's Use of Deadly Force in Illinois, 48 Chicago-Kent L.Rev. 252 (1971); Comments, Model Penal Code, Tentative Draft #8, § 3.07 (1958).
[3] 14 McGill L.J. at 311.
[4] In Beech v. Melancon, 465 F.2d 425 (6th Cir. 1972), in a concurring opinion, it was noted that the subsequent act of the accused in fleeing indicates threat to the community.
[5] Ala.Stat. § 11.15.090 (1970)
Arizona: Ariz.Rev.Stat. § 13-461 (1956)
Arkansas: Ark.Stat. § 41-2238 (1964)
California: Cal.Penal Code §§ 196, 197 (West 1969)
Colorado: Colo.Rev.Stat. §§ 16-3-101, 18-1-707 (1973)
Connecticut: Gen.Stat. of Conn. § 53a-22 (1973)
Florida: Fla.Stat.Ann. § 782.02 (1965)
Georgia: Code of Ga. § 26-901 (1971)
Hawaii: Hawaii Rev.Stat. Title 37, § 708-7 (1968)
Idaho: Idaho Code Ann. § 19-610 (1947)
Illinois: Ill.Rev.Stat., ch. 38, § 7-5 (1970)
Iowa: Iowa Code Ann. § 755.8 (1946)
Kansas: Kan.Stat.Ann. § 21-3215 (1970)
Kentucky: Ky.Rev.Stat. § 431.025 (1974)
Louisiana: La.Code Crim.Proc. § 220 (West 1967)
Minnesota: Minn.Stat.Ann. § 629.33 (1945)
Mississippi: Miss.Code Ann. § 97-3-15 (1972)
Missouri: Rev.Stat. of Mo. §§ 544.190, 559.040 (1969)
Montana: Rev.Code of Mont. §§ 94-2512, 94-2513 (1947)
Nevada: Nev.Rev.Stat. § 200.140 (1973)
New Hampshire: N.H.Rev.Stat. § 594.4 (1974)
New Jersey: N.J.Stat.Ann. § 2A:133-6 (1969)
New Mexico: N.M.Stat.Ann. § 40A-2-7 (1963)
Ohio: Ohio Rev.Code § 3773.04 (1953)
Oklahoma: Okla.Stat.Ann., ch. 21, § 732 (1951)
Oregon: Ore.Rev.Stat. § 161.239 (1974)
Rhode Island: Gen.Laws of R.I. § 12-7-9 (1969)
South Carolina: Code of Laws of S.C. § 17-252 (1962)
South Dakota: S.C. Compiled Laws § 22-18-2 (1967)
Tennessee: Tenn.Code § 40-808 (1956)
Texas: Texas Code of Crim.Proc. § 15.25 (1965)
Utah: Utah Code Ann. § 77-13-11 (1953) (warrant required)
Vermont: Vt.Stat.Ann., Title 13, § 2305 (1974)
Washington: Rev.Code of Wash. § 10.31.050 (1961)