Martha WILEY, mother and next of kin
of Fred Lee Berry, a Deceased minor,
Plaintiff-Appellant,

v.

MEMPHIS POLICE DEPARTMENT et
al., Defendants-Appellees.

No. 75–2321.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1976.

Decided Feb. 10, 1977.

**1248**

G. Philip Arnold, Ratner, Sugarmon, Lucas & Salky, Memphis, Tenn., William E. Caldwell, Paul R. Dimond, Washington, D.C., Jack Greenberg, New York City, for plaintiff-appellant.

Arthur J. Shea, Charles V. Holmes, Asst. City Attys., Memphis, Tenn., for defendants-appellees.

Robert S. Catz, Howard S. Scher, Gerald J. Wein, Urban Law Institute, Inc., Washington, D.C., amicus curiae.

Before WEICK and McCREE, Circuit Judges, and MILLER,* Judge of the United States Court of Customs and Patent Appeals.

WEICK, Circuit Judge.

This is an appeal from a judgment for the defendants after a non-jury trial of an action seeking $1,000,000 damages and declaratory relief, brought by Martha Wiley against police officers and municipal defendants. Wiley sued for the alleged wrongful death of her son, Freddie Lee Berry, who was nearing his seventeenth birthday when he was shot and killed in the night season while fleeing from a sporting goods store in which the police officers had observed him and two companions in the commission of a burglary.

Jurisdiction of the Court was invoked under 28 U.S.C. §§ 1331(a), 1343(3), and 1343(4) for alleged causes of action under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988, and under the Fourth, Fifth, Sixth, Eighth, Thirteenth and Fourteenth Amendment to the Constitution. Pendent jurisdiction was invoked seeking similar relief under Tennessee law.

Plaintiff challenged the deadly force policy of the City of Memphis and the Memphis Police Department (MPD), which policy authorized police officers to use deadly force whenever they deemed it necessary to effect the arrest of a felon. Plaintiff claimed that such policy was a violation of the constitutional rights of her decedent. The defense was that such policy was specifically authorized by and conformed to Tenn. Code Ann. § 40–808, which provides:

*Resistance to Officer.*—If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest.

Jury was waived and the trial was held by the Court over a period of four days. The Court gave careful consideration to all of the issues and handed down a Memorandum Opinion consisting of twenty-two pages, in which it made findings of fact and adopted conclusions of law. The findings with respect to the burglary, the attempts of the officers to arrest the burglars, and the shooting, are appended hereto as Exhibit "A".

Briefly, the facts are that on the night of January 8, 1972, officers Calliham, Roleson, Cox and Richards responded to a radio dispatch about prowlers inside a sporting goods store in Memphis, Tennessee. Officer Calliham went to the front door of the store and saw three black males inside, in the area of a soft drink machine. Officer

---

* The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

Calliham yelled to the males to come out; they looked up and dispersed. Officers Cox and Richards were informed by Calliham as to what he had seen, and those officers drove to the northeast area behind the building. As they were getting out of their car they saw two black males run from the rear of the south portion of the building. It was raining but the storage lot was lighted and the officers could see the two youths who either climbed over or went under the fence into a large drainage ditch. As found by the Court, it was "dark and obscure" along the drainage ditch, and the area was cluttered with brush and debris. Officers Richards and Cox repeatedly yelled for the fleeing youths to "halt," but they paid no heed and kept on running. Both officers decided to fire at the youths. A subsequent search of the area revealed Freddie Lee Berry, plaintiff's decedent, critically wounded, lying approximately 208 feet down the ditch from the point where Cox and Richards had fired. The officers' investigation revealed also a "stash" consisting of two shotguns and ammunition taken from the sporting goods store and placed in the ditch near the spot where Berry was found. The second suspect escaped but later surrendered at police headquarters. The third youth was captured when he was found hiding in the sporting goods store.

The complaint named as defendants the Memphis Police Department (MPD), the City of Memphis, Tennessee, Bill Price, Chief of Police of Memphis, Wyeth Chandler, Mayor of Memphis, Henry Loeb, former Memphis Mayor, M. J. Calliham, R. D. Roleson, B. J. Cox, J. K. Richards, W. W. Wannamaker, and Jule Ray, all Police Officers of the City of Memphis, and John Doe and others similarly situated.

The complaint charged that MPD, the City, the Chief of Police, the Mayor and former Mayor, all were responsible for the policies, practices, customs and usages pertaining to the use of firearms by the police officers, which policies violated the constitutional rights of plaintiff's decedent resulting in his death.

The facts as found by the District Judge, however, were that these policies, practices, customs and usages were authorized by the Legislature of Tennessee in its enactment more than one hundred years ago, of the present language of T.C.A. § 40–808, hereinabove set forth. This language appeared as Section 5040 of the Tennessee Code of 1858, the first official code of Tennessee, and embodied the common law of that State. *Love v. Bass,* 145 Tenn. 522, 529, 238 S.W.94 (1921); *Reneau v. State,* 70 Tenn. 720 (1879).

The Court made the following findings with respect to plaintiff's decedent:

> Berry, beginning at a very early age, had been the subject of frequent proceedings in the Memphis Juvenile Court, including two formal adjudications in the nature of criminal proceedings. He was found guilty of burglary at age 13 and placed on probation, but a year later he was expressly found to have committed a delinquent act and ordered as a delinquent to a state juvenile institution indefinitely. After release, he was later the subject of other charges, including school problems similar in character to those preceding commitment. [Footnotes omitted].

(App. 000238)

The Court further found that the officers did not know that two of the burglars were juveniles, and that the officers acted in good faith. The Court stated:

> Both defendants Cox and Richards were familiar with the SBM Co. location; both had investigated prior burglaries there; they had driven around the building through its front parking lot onto Ferguson Street; and they had driven to the back of the building through the adjacent parking area to the south and behind neighboring buildings to the south. They both knew about the ditch and the direction in which it ran and the fence surrounding it. At the time there was considerable brush and bushes in the area, and debris in the ditch. It was possible for Cox and Richards to have driven along side the ditch by proceeding

back on Ferguson, turning onto Bellevue and going around to the parking area to the south nearby the place the youths were running down the ditch, but it was likely they would have escaped just as Lurry actually did that very night.

Under the peculiar circumstances—night darkness, rain, intervening barbed wire fences, the distance between them and the suspects and availability of cover, neither Cox nor Richards could reasonably expect to chase or otherwise catch or capture the fleeing felons. They could not be sure the suspects were not armed. The court finds that these alternatives to the use of deadly force in the circumstances of this case were not available to defendants Cox and Richards, if they were to attempt to apprehend Berry and his companion in crime.

Both officers Cox and Richards testified that they shot without attempting merely to wound or incapacitate the fleeing two, and that they were trained that whenever they use their firearms to "shoot to kill." At the distance involved and under these circumstances, any attempt merely to cripple or to wound would probably have been ineffectual. Defendant Lux denied that Memphis police were, in fact, instructed to shoot to kill in all fleeing suspect circumstances. It would appear that they were instructed to fire at the torso.

(App. 000242–43)

The defendants, Cox and Richards, employed the only practicable means available to them under peculiarly difficult circumstances requiring split second judgment to prevent the deliberate attempt to escape of one caught in the midst of a felonious burglary. Plaintiff failed to carry the burden of proving that Cox or Richards either knew or should have known that Berry was a juvenile. These officers could not surely have known whether defendants were or were not armed, and it later developed that stolen weapons were indeed nearby and available to them. To ascribe to plaintiff's counsel's contentions under these facts would be to recognize a felon's constitutional right to escape if the only reasonable and practicable means to prevent it were to employ potentially lethal force by use of a firearm. This is indeed borne out by Lurry's successful escape under these identical circumstances. In a real sense, this court is being called upon by plaintiff to rule the allowable Tennessee law procedures, more stringently applied in Memphis by the MPD, to be declared unconstitutional in the face of a three judge court's contrary determination less than a year before this episode. This court agrees with the opinion there expressed, 323 F.Supp. 1075, that "this is a policy decision for the Tennessee Legislature or perhaps the Tennessee courts and not for federal courts in the guise of constitutional adjudication. Compare the concurring opinion of Judge McCree in *Beech v. Melancon,* supra. In any event, Cox cannot be held liable because his actions cause no harm or damage to plaintiff. Berry died shortly after he was shot *without gaining consciousness.* Nor can the court hold the other defendants liable under the circumstances for constitutional or illegal deprivation of plaintiff's rights. [Footnote omitted.]

(App. 000252–53)

The constitutionality of T.C.A. § 40–808 had already been upheld in this Circuit by a three-judge District Court consisting of Circuit Judge Harry Phillips and District Judges Bailey Brown and Robert M. McRae, Jr., in *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971). In that case the statute was attacked in a case similar to the present one, involving the Memphis police, where the decedent was shot and killed by police officers who were investigating a burglary attempt and while he was fleeing from arrest by the officers. It was claimed that the statute was unconstitutional on its face because it permitted the use of cruel and unusual punishment in violation of the Eighth Amendment; that it was unconstitutionally overbroad; that it was an unconstitutional incursion with respect to a person's right to a trial by jury, confrontation

of witnesses, assistance of counsel, etc.; and that the statute violated the due process clause of the Fourteenth Amendment.

The Court stated at 1074–75:

It is agreed by all parties that, as construed by the Tennessee courts, this statute means, in the present context, that an officer may use force that may result in death in preventing the escape of a person that he is attempting to arrest if (1) he reasonably believes that the person has committed a felony and (2) he notifies the person that he intends to arrest him and (3) he reasonably believes that no means less than such force will prevent the escape. The parties also agree that, so construed, the statute merely states the common law. *Reneau v. State,* 70 Tenn. 720 (1879); *Love v. Bass,* 145 Tenn. 522, 238 S.W. 94 (1921); *Scarbrough v. State,* 168 Tenn. 106, 76 S.W.2d 106 (1934); *Johnson v. State,* 173 Tenn. 134, 114 S.W.2d 819 (1938).

With respect to the Eighth Amendment the Court stated at 1075, ". . . we simply are not dealing with punishment." The Court further held that the statute was not unconstitutionally vague and that it did not violate the Fourteenth Amendment.

We considered the constitutionality of T.C.A. § 40–808 in another case, *Beech v. Melancon,* 465 F.2d 425 (6th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973), wherein two robbers were shot and one of them killed by Memphis police when they were attempting to rob a gas station and to escape from the scene of the felonious activity. They had been informed that the defendants were police officers and had been warned to halt, but they did not do so. In that case the single issue was whether the trial judge was clearly in error in concluding that the defendants were justified in the use of deadly force in order to apprehend the culprits.

In finding that the District Judge had evidence to justify his finding that the "officers used only the necessary means to effect the arrest," this Court, with Judge McCree concurring in the result, followed *Cunningham v. Ellington, supra,* in upholding the constitutionality of the statute.

However, what is more important is the fact that the Court stated at page 426:

In any event the police officers were entitled to assume the constitutionality of the Tennessee Statute. "State statutes like federal ones are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Company v. Bowles,* 321 U.S. 144, 153, 64 S.Ct. 474, 479, 88 L.Ed. 635 (1944), and see also *McDonald v. Board of Election,* 394 U.S. 802, 808, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *Davis v. Department of Labor,* 317 U.S. 249, 257, 63 S.Ct. 225, 87 L.Ed. 246 (1942).

■ In the present case, at the time the officers were pursuing the burglars in the dark of a rainy night, there was considerable brush and bushes in the area, and debris in the ditch, and the officers did not have the opportunity or the time to ascertain whether the statute which authorized them to use all means necessary to effect the arrest was constitutional. They had a right to assume that the statute was constitutional. It had been twice so declared in this Circuit, first by the three-Judge Court, and later by this Court, and its invalidity, or that of a similar statute, up to that time had never been declared by any Court. The plaintiff has not cited a single case to the contrary decided prior to the burglary involved in the present case.

The officers knew that the sporting goods store sold weapons. They were not required to assume that the burglars were unarmed and would not shoot at them. As a matter of fact, the "stash" of stolen arms and ammunition was found near the body of Berry where he had fallen. Although two of the burglars, unknown to the officers, were juveniles, they were undoubtedly able not only to commit the burglary, but also to pull the trigger of a gun and shoot and kill the officers.

In *Terry v. Ohio,* 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968), the Supreme Court said:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

See also *Wolfer v. Thaler,* 525 F.2d 977 (5th Cir. 1976), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1976); *Jones v. Marshall,* 528 F.2d 132 (2d Cir. 1975); *Hilton v. State,* 348 A.2d 242 (Me.1975); *Schumann v. McGinn,* 240 N.W.2d 525 (Minn. 1976).

The decision of the three-Judge District Court in *Cunningham v. Ellington, supra,* was followed in *Mattis v. Schnarr,* 404 F.Supp. 643 (E.D.Mo.1975), where the Court, in considering a statute virtually identical with the Tennessee statute, stated at 651:

> Again the Court notes that any classification which would allow deadly force to be used against persons who have committed certain specified crimes, and not against other offenders would inevitably be subject to the same attack as plaintiff wages here. To abolish the use of deadly force altogether is to deprive the state and its citizens of their rights to security, safety and a feeling of protection. To pick and choose those crimes warranting the application of these statutes is the duty of the legislature. It involves a determination of the effect and seriousness of crimes on society and such a determination lies exclusively within the province of the legislative branch. It is not the role of a federal judge to legislate for the people of a state.

The Court, in its opinion, cited similar statutes of thirty-four states authorizing the use of such force, which use of force is sought to be held unconstitutional here. These statutes merely embodied the common law which has been in force for centuries and has been universally recognized.

Upon appeal to the Eighth Circuit, in Appeal No. 75–1849, heard en banc, the Court in a four-to-three decision, reversed the District Court on December 1, 1976. The majority opinion rejected our decision in *Beech v. Melancon, supra* ; the decision of the District Court in the present case; the decision of the three-Judge District Court in *Cunningham v. Ellington, supra* ; the Second Circuit decision in *Jones v. Marshall, supra* ; and the Fifth Circuit decision in *Wolfer v. Thaler, supra.* It even erroneously stated 528 F.2d 141, n. 21 that the Court in *Wolfer v. Thaler* had held that the parents did not have standing to sue despite the statement in *Wolfer* (at 978, n. 1) that the parents did have standing.

The Eighth Circuit is the only Court to our knowledge which has ever held that such a statute, which is so necessary even to elementary law enforcement, is unconstitutional. It extends to the felon unwarranted protection, at the expense of the unprotected public.

We agree with the dissent in the Eighth Circuit case (*Mattis v. Schnarr*), which was highly critical of the majority opinion for not following the decisions of other Circuits and for embarking on a new course which should have been left to the state legislatures where it belongs.

The legislative bodies have a clear state interest in enacting laws to protect their own citizens against felons, and a right, if not a duty, to do so. When the burglar escapes pursuit he is free to commit other felonies. The dissent appropriately pointed out:

> In 1934 the ALI, in its First Restatement of Torts, modified the common law principle permitting the use of deadly force to effect the arrest of a felon. *Restatement (First) of Torts* § 131 (1934). This modification was abandoned in 1948, however, and the common law rule was readopted. The 1966 Appendix to the

Second Restatement of Torts justifies this abandonment on the grounds that the modification contained in § 131 had, from its inception, lacked any support other than dicta and argument by analogy.

The dissent further states:

There is no constitutional right to commit felonious offenses and to escape the consequences of those offenses. There is no constitutional right to flee from officers lawfully exercising their authority in apprehending fleeing felons.

The majority opinion of the Eighth Circuit in *Mattis* does not suggest how law enforcement officers are to make the on-the-spot constitutional analysis called for by its proposal and still react quickly enough to meet the exigencies of an emergency situation. How can a police officer ever know, reasonably or otherwise, whether the felon will use force against others if he is not immediately apprehended? It is clearly the prerogative of the state legislature to decide whether such restrictions on the use of force are consonant with public policy.

The facts in this case are significantly different from the facts in *Mattis v. Schnarr, supra.* That case involved the burglary of the office of a golf driving range, while this case involved the burglary of a sporting goods store where weapons and ammunition were sold. The officers in the present case could have assumed, reasonably, that the two young males might be armed and reasonably could have feared for their lives. Further, the "stash" of shotguns and ammunition found in the ditch near where the decedent was found, reinforces the fact that the officers might have been shot had they not reacted quickly to the emergency.

It should always be remembered that both officers were shooting in the dark, 208 feet away from the youths, and that the youths were fast escaping. The bullet fired by the pistol of Officer Cox only grazed Berry, and Officer Richards was able to hit Berry, using a shotgun by which only one of the pellets struck and killed him.

■ Under Tennessee law the determination of whether or not there was a reasonable necessity for the killing, and the reasonableness of the grounds upon which the officer acted in shooting, are questions for the jury. *Love v. Bass,* 145 Tenn. 522, 529, 238 S.W. 94 (1921). The District Judge determined these factual issues against the plaintiff.

In *Qualls v. Parrish,* 534 F.2d 690 (6th Cir. 1976), this Court, in an opinion written by Judge McCree, cited *Love v. Bass, supra,* with approval and held that the law of the state should be considered in determining the federal law to be fashioned to determine the liability of the officers. There the Court stated at 694:

Our principal reason for agreeing with the district court that the Tennessee rule should be made the federal rule in this case is that a decision to the contrary would be unfair to an officer who relied, in good faith, upon the settled law of his state that relieved him from liability for the particular acts performed in his official capacity. Most of the state courts that have considered this question follow the old common law rule that deadly force may be used by a police officer only when he has reasonable grounds to believe that the person he is attempting to arrest has committed a felony.

■ There can be no question but that the officers in the present case had such reasonable grounds because they actually saw the burglars in the store as they were burglarizing the store. The officers pursued the burglars as they were fleeing from the scene of their crime. Since the burglars were still being hotly pursued they are regarded as being engaged in the commission of the burglary at the time of their pursuit. *United States v. Jarboe,* 513 F.2d 33 (8th Cir. 1975); *United States v. VonRoeder,* 435 F.2d 1004 (10th Cir. 1971).

■ We are of the opinion that there was substantial evidence to support the factual findings of the District Court and they are not clearly erroneous. The Court's conclusions of law are correct.

We are of the opinion further that MPD, the City, the Mayor, and the former Mayor, and the Chief of Police had the same right to rely on the law of Tennessee and the decisions of this Court and the decision of the three-Judge Court in formulating their policies. Also, they could rely on the presumption that the Tennessee statute was constitutional and on the fact that no court at that time had ever held that statute or a similar statute to be unconstitutional.

■ The District Court did not exercise pendent jurisdiction although it stated that plaintiff's state court claims would fail under the decision which it reached. Plaintiff did not appeal from the Court's refusal to exercise pendent jurisdiction, and therefore that issue is not before us. Likewise, the Court declined to find subject matter jurisdiction of plaintiff's constitutional claims against the city, under 28 U.S.C. § 1331(a). We note here that this ruling was erroneous. Municipalities may be sued directly for Fourteenth Amendment violations through 28 U.S.C. § 1331(a). *Amen v. Dearborn*, 532 F.2d 554 (6th Cir. 1976). The Court did, however, assume subject matter jurisdiction over the other defendants and did consider and decide the constitutional issue as well as the other issues in the case.

■ The District Court held with respect to plaintiff's claim of racial discrimination that "plaintiff has failed to persuade the court that under the circumstances of this case defendants have discriminated against her or against her son because of their race."

Nor did the Court find a denial of equal protection when it said:

No racial animus or basis is shown to motivate the policy involved. Both white and black fleeing felons have been shown by plaintiff's own proof to have been fired upon or shot by Memphis police as a matter of last resort where otherwise arrest cannot be reasonably accomplished and escape is inevitable, even in the case of so-called property crimes.

In our opinion these findings of fact are supported by substantial evidence and are not clearly erroneous.

As to racial impact, the Supreme Court in *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) stated:

. . . [O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.

The judgment of the District Court is affirmed.

## APPENDIX

### Exhibit "A"

On the night of January 8, 1972, shortly after 8:00 P.M., the police radio dispatcher for the MPD's South Precinct put out a call: "Bellevue and Ferguson at sporting goods,[4] prowlers inside." Officers Calliham and Roleson in a police patrol car responded to the call and were the first to arrive on the scene, although defendants Cox and Richards also arrived on the scene in a patrol car almost simultaneously. SBM Co. is located at the south-east corner of South Bellevue (a street which runs in a north-south direction, a major thoroughfare, and Ferguson (an east-west street). It has a storage yard in the back (to the east) and to the northeast of the building which fronts on South Bellevue, facing west, with the main entrance being in the northwest corner of the building. The storage yard is bordered by a chain-link cyclone fence which is about 6 feet high with three strands of barbed wire on top. The fence separates the storage yard from a large drainage ditch which runs north and south at the back of the SBM Co. property, and which runs through a culvert under Ferguson Street. There is also a similar east-

---

**4.** South Bellevue Marine Company was the location, a sporting goods store specializing in boats, boat motors, and other marine equipment. It is referred to hereinafter as SBM Co.

west chain-link fence separating Ferguson Street from the ditch at the point where the street crosses the ditch, and a north-south chain-link fence also separates the drainage ditch on the eastern bank from the home of one Don Krag. These fences prevent access to SBM Co. or the ditch from Ferguson. From the point where it intersects with Ferguson Street, the drainage ditch runs due south for several hundred feet before curving to the west where it intersects with South Bellevue. To the east of the southern portion of the ditch, south of the Krag home, is a large housing project inhabited primarily by black families. There is a large paved area to the south of SBM Co. property along the ditch in question. This parking area is also separated from the drainage ditch by a chain-link fence, but this fence is not as high as the one surrounding SBM Co.

When officers Calliham and Roleson arrived on the scene, they stopped their patrol car directly in front of SBM Co. which has a large glass front. Officer Calliham went to the front door and officer Roseson [sic] began running south in front of the building for the purpose of circling around behind the building at the point where the parking area adjoins the storage yard to the south. The inside of the SMB Co. was well lighted and Calliham could see three male blacks inside in the area of a soft drink machine. Richards and Cox who had also just arrived were so informed. Cox and Richards proceeded in the patrol car north and turned east on Ferguson Street along the north side of SBM Co. They stopped their car near the point where Ferguson crosses the drainage ditch. As Cox and Richards were getting out of their car, they saw two male blacks running out of the rear of the south portion of the building near the fence which separates the storage yard from the adjacent parking lot. It is approximately 54 feet from the back of the building along this east-west fence to the north-south fence along the drainage ditch. It was raining but the storage lot was lighted and the officers could see the two, who kept running and either climbed over or went under the north-south fence into the drainage ditch which was dark and obscure. Richards and/or Cox yelled for them to "halt" repeatedly as they ran from their patrol car to the fence which separates the ditch from Ferguson Street. The two fleeing males paid no heed to the commands to stop, but instead continued running into and down the drainage ditch away from the officers.

At this time Cox and Richards both decided to fire at the two fleeing suspects, concluding they could not apprehend them otherwise. Cox fired twice with his .38 caliber police special pistol and Richards fired three times with a shotgun loaded with buckshot. The firing was almost simultaneous.[5] Richards did not exhaust his available shots. Defendant Richards saw one of the suspects appear to stumble upon his second or third shot. An ambulance was immediately called and a search of the ditch revealed Freddie Lee Berry lying face down a distance of some 208 feet down the ditch from where Cox and Richards had fired, and roughly 20 feet from where the youths had gone into the drainage ditch. Subsequent investigation by these officers after firing also revealed a "stash" consisting of two shotguns and ammunition apparently taken from SBM Co. and placed in the ditch nearby where Berry was found. It is reasonable to assume Berry and his companion had not only broken in SBM Co. but had burglarized it, and were in the process of continuing the felony when interrupted. Berry had been wounded in the back of the head with a shotgun pellet and had also received a chin "graze" from another gunshot. He was alive but unconscious at the time he was found and was taken to the hospital where he died shortly thereafter.

The other black male fleeing with Berry was Thomas B. Lurry, age 17, who escaped.

5. Neighboring property owner Don Krag stated that it sounded to him as if only one gun was being fired.

He later turned himself in at police head-quarters and was adjudicated as a delinquent juvenile.

(App. 000239–42)

McCREE, Circuit Judge (Concurring).

I concur in the result because I do not regard this appeal as requiring us to decide whether the rule that permits a police officer to use deadly force to apprehend a fleeing felon when there is no threat to human life is constitutional. On several occasions, we have approved a rule that permitted the use of deadly force by police officers to apprehend a suspected felon when the felon appeared to present a threat to human life. Appellants urge that these decisions do not control this case because there was no such threat here. The district court, however, relied both on the fact that the officers could not have known whether the fleeing persons were armed and on the fact that no other means existed by which they could have been apprehended. There is sufficient evidence in the record to support the conclusion that the fleeing felons in this case did present an apparent threat to human life, and therefore I join in the decision of the court.

Although I agree that reliance on the law by a state officer may exonerate him from personal liability in damages, I do not regard reliance by the officer as precluding declaratory relief if action in reliance on an existing rule violated the constitutional rights of the decedent.