Mary JACOBS, and Mary Jacobs, Special Administratrix of the Estate of Bobby Ray Jacobs, Deceased, Plaintiffs,

v.

The CITY OF WICHITA, and Ray Riniker, Defendants.

Civ. No. 79–1476.

United States District Court, D. Kansas.

Feb. 2, 1982.

Fred W. Phelps, Jr., Topeka, Kan., for plaintiffs.

S. A. Issinghoff, Asst. City Atty., Wichita, Kan., for Riniker.

H. E. Jones, Wichita, Kan., for City of Wichita.

MEMORANDUM AND ORDER

KELLY, District Judge.

As the Court understands the facts of this case, the critical events took place during the late evening hours of July 9, 1979, when defendant Ray Riniker, a Wichita police officer who had just begun his shift, was dispatched to investigate a silent entry alarm at the offices of Wichita's Local Housing Authority. Very shortly after his arrival at the Housing Authority Building, Riniker heard a door crash open and saw plaintiffs' decedent, Bobby Ray Jacobs, a black teenager, running away from the building. Riniker shouted "halt, police," several times but his cries were ignored; Jacobs ran across the well-lit Housing Authority grounds, and by scaling or hurdling two fences made his way into the backyard of an adjacent residence. As Jacobs made his way over these fences, Riniker fired a shotgun at him, but that first shot missed. Jacobs was going over a third fence into the residence's front yard when Riniker, who was still on the Housing Authority grounds, fired a second shot which struck and killed Jacobs. Riniker believed that Jacobs had committed a burglary of the Housing Authority offices and that the shooting was necessary to prevent Jacobs from escaping. Plaintiffs bring this action under 42 U.S.C. § 1983, and assert that the shooting violated Jacobs' rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution.

This case is now before the Court on plaintiffs' motion for determination of law in advance of trial; plaintiffs seek a determination that K.S.A. 21–3215(1) [1] is uncon-

1. In relevant part, this statute provides that a law enforcement officer

is justified in the use of any force which he reasonably believes necessary to effect [a

stitutional to the extent that it authorizes the shooting of the unarmed perpetrator of a nonviolent felony who, although fleeing, had threatened the life of neither the arresting police officer nor anyone else.

■ In view of the fact that K.S.A. 21–3215 seems never to have been construed by the Kansas appellate courts, the Court is somewhat surprised that plaintiffs apparently agree with defendants that the statute both applies to this case and reflects a codification of the common law privilege to use deadly force against all fleeing felons. It is worth noting that the statute is included within an article of the Kansas Statutes Annotated entitled "Principles of Criminal Liability," and legislative intent to immunize policemen against criminal liability does not necessarily imply an intent to immunize them against civil liability. *See Schumann v. McGinn*, 307 Minn. 446, 240 N.W.2d 525 (1976). It might also be noted that the statute can be read such that it does not apply to the use of force against a nonviolent felon, but only to use of force against one who has committed a felony "by use of a deadly weapon," or who has "otherwise" indicated that he is a threat to life and limb. *Cf., e.g., Kortum v. Alkire*, 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26, 30–31 (1977) (construing similar California statute). In the present case, however, the Court need not endeavor to decipher the intent of the Kansas Legislature because that intent is simply irrelevant. As explained by the Court of Appeals for the Second Circuit:

> It has long been understood that in interpreting the scope of § 1983 we are not bound by the state law of torts or the defenses of privilege that law provides. In an unbroken line of Supreme Court cases ... the conduct of police officers

and other state officials has, both civilly ... and criminally ..., been held subject to standards demanded by the Constitution of the United States, regardless of approbation by state law .... A state rule of immunity or privilege which allows a state officer to escape liability for a deprivation of "rights, privileges, or immunities secured by the Constitution of the United States" is simply not controlling under 42 U.S.C. § 1983.

*Jones v. Marshall*, 528 F.2d 132, 137 (2nd Cir. 1975) (citations and footnote omitted). Indeed, the Kansas statute is only relevant to the case *sub judice* insofar as it might support or undercut Officer Riniker's claimed defense of good faith immunity.[2] See *Ayler v. Hopper*, 532 F.Supp. 198 (M.D. Ala.1981).

■ The Court does not believe, however, that it adequately fulfills its duties to these litigants, who have extensively briefed the question of the statute's constitutionality, by declaring simply that state law does not control the merits of this case. The possibility remains that the common law justification of deadly force against all fleeing felons, which the parties have regarded as codified in K.S.A. 21–3215(1), should be adopted as the standard of privilege in actions brought under the Federal Constitution. *See Jones v. Marshall*, supra. This possibility must be rejected. To be sure, the common law is venerable, but that does not suffice to justify its adoption as a constitutional standard; what is required, rather, is a considered inquiry into both the historical background of the rule and the principles that underly it. *See, e.g., Butz v. Economou*, 438 U.S. 478, 508–517, 98 S.Ct. 2894, 2911–2916, 57 L.Ed.2d 895 (1978) (discussing qualified and absolute official immunities). As Justice Holmes once wrote:

lawful] arrest.... However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or another person, or when he reasonably believes that such force is necessary to prevent the arrest from being defeated by resistance or escape and the person to be arrested has

committed or attempted to commit a felony or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

2. Under *Owen v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), this defense is not available to the City of Wichita.

It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Holmes, *The Path of the Law*, 10 Harv.L. Rev. 457, 469 (1897). Examination of the history of the common law felony arrest privileges reveals that it is the example *par excellence* of a rule that has outlived its underpinnings of principle and policy. When the rule arose, only a few crimes were classified as felonies,[3] and all of these crimes were capital offenses; firearms that could kill at a distance were not generally available; and there was virtually no communication among law enforcement officials in different communities. In context, then, the common law rule meant that persons suspected of capital crimes could be killed if, as was likely given the consequences of their apprehension, they resisted arresting police in a hand to hand struggle; it did not mean that they could be killed from behind, at a distance, while they were in flight. *See* Sherman, *Execution Without Trial: Police Homicide and the Constitution*, 33 Vand.L.Rev. 71, 75 (1980). The use of deadly force was seen as little more than an acceleration of the penal process, since the felon had already forfeited his life by committing the offense and, if not caught by his initial pursuers, was likely to avoid ultimate arrest altogether by escaping to a different locale. *See Mattis v. Schnarr*, 547 F.2d 1007, 1011–12 n.7 (8th Cir. 1976) (en banc), *vacated per curiam as advisory opinion sub nom. Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), and authorities cited therein. It should also be noted that inasmuch as no action for wrongful death existed at common law, *see* 25A C.J.S. *Death* § 13, the entire scope of the rule was to protect the constable from criminal liability.

The context of the rule began to change with the introduction of the mass-produced revolver and its use by police who could thus shoot those suspected of an ever-growing list of noncapital felonies, even though the suspect might pose no immediate threat to anyone, and even though police agencies in different communities were acquiring the capacity to communicate with one another. *See* Sherman, *Execution Without Trial, supra*, 33 Vand.L.Rev. at 75–76. Moreover, upon the recognition of statutory wrongful death actions and their constitutional analogues, commencing with the adoption of Lord Campbell's Act in 1846, *see* 25A C.J.S. *Death* § 15, the scope of the rule was broadened considerably since it came to apply not merely to the criminal liability of the policeman but the civil liability of the policeman and the governmental unit that employs him. Today, if the applicable rule of constitutional privilege extends to deadly force necessary to arrest any fleeing felon, then the rule permits the killing not merely of armed murderers, but of unarmed felons who have committed such crimes as draft evasion, antitrust conspiracy, or, in some jurisdictions, spitting on a policeman, *see* Comment, Policeman's Use of Deadly Force in Illinois, 48 Chi.-Kent.L. Rev. 252, 252 (1971). In the present case, such a rule would permit the killing of an unarmed, nonviolent teenage burglary suspect.

What is wrong with such a rule should be obvious. As Professor Wechsler has stated:

> [T]he preservation of life has such moral and ethical standing in our culture and society, that the deliberate sacrifice of life merely for the protection of property ought not to be sanctioned by law.

35 A.L.I. Proceedings 285 (1958). This is not merely a matter of personal preference, or a case of policy choice best left to the legislature, as some would have it, *see, e.g., Wiley v. Memphis Police Dept.*, 548 F.2d 1247 (6th Cir.), *cert. denied* 434 U.S. 822, 98

---

**3.** While burglary was a felony at common law, the break-in of which Jacobs was suspected would not have qualified as burglary since unoccupied business premises would not qualify as the "dwelling house of another." See 12A C.J.S. *Burglary* § 2.

S.Ct. 65, 54 L.Ed.2d 78 (1977).[4] When the state kills a fleeing felon, it has taken from him the supreme, fundamental right: the right to life, fittingly called "the right to have rights" by Justice Brennan, *Furman v. Georgia*, 408 U.S. 238, 290, 92 S.Ct. 2726, 2752, 33 L.Ed.2d 346 (1972) (concurring opinion). Because we are dealing with the most fundamental of all rights, the substantive aspects of the Fourteenth Amendment Due Process Clause are implicated, *Mattis v. Schnarr, supra*, 547 F.2d at 1017–19; *Ayler v. Hopper, supra; cf. also Roe v. Wade*, 410 U.S. 113, 152–56, 93 S.Ct. 705, 726–28, 35 L.Ed.2d 147 (1973) (substantively protected right to abortion); *Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (substantively protected right to have one's grandchildren live in one's home); *Zablocki v. Redhail*, 434 U.S. 374, 391, 98 S.Ct. 673, 683, 54 L.Ed.2d 618 (1978) (Stewart, J., concurring) (substantively protected right to marry); and state infringement of the right to life can be countenanced only if the infringement is necessitated by a "compelling state interest" and is "narrowly drawn to express only the legitimate state interests at stake." *Mattis v. Schnarr, supra*, 547 F.2d at 1019; *Ayler v. Hopper, supra; Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 727. The only state interest that could possibly be sufficiently compelling to justify the killing of a felony suspect without any process at all would be the state's interest in protecting its police, and the public at large, from death or bodily injury; yet a rule of privilege that allows the killing of a nonviolent, unarmed burglary suspect is not narrow enough to express only this interest. Moreover, the overwhelming weight of scholarly opinion and the clear trend in the policies of police departments nationwide (including the Wichita Police Department) suggest that policies which permit the use of deadly force against nonviolent felony suspects will soon be consigned to the historical scrap heap as inconsistent with the evolving standards of a maturing society. Sherman, *Execution Without Trial, supra*, 33 Vand.L. Rev. at 91–93.

The Court is aware, of course, that other courts have viewed this issue differently. *See Jones v. Marshall, supra; Wiley v. Memphis Police Dept., supra*. The *Jones* court's endorsement of the common law privilege was plainly reluctant, however, *see* 528 F.2d at 142–43, and the Court of Appeals for the Sixth Circuit has retreated from its *Wiley* defense of the common law rule and adopted the more moderate view expressed by Judge McCree in his concurring opinions in *Wiley* and in *Beech v. Melancon*, 465 F.2d 425, 426 (6th Cir. 1972), *cert. denied* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973): the Sixth Circuit Court of Appeals now reads its prior opinions as based on the good faith immunity of the individual police officers, *not* on the constitutionality of the common law rule. *See Garner v. Memphis Police Dept.*, 600 F.2d 52, 54 (6th Cir. 1979). The Court of Appeals for the Eighth Circuit has, in the meantime, reaffirmed its *Mattis* rejection of the common law privilege in *Landrum v. Moats*, 576 F.2d 1320 (8th Cir. 1978).

IT IS ACCORDINGLY ORDERED that plaintiffs' motion for a declaration that K.S.A. 21–3215(1) is unconstitutional be denied; the jury, however, will be instructed in accord with this opinion.

---

4. Since state law is not relevant to determination of the federal constitutional issues in this case, and since Congress has had nothing to say on these matters, even if this case were one in which deference to a legislature were appropriate, it would be hard to say which legislature this Court should defer to.