Mark A. TRUSS, Plaintiff,

v.

Paul R. COLLIER, et al., Defendants.

No. C–3–78–44.

United States District Court, S.D. Ohio, W.D.

April 8, 1983.

---

Frederick M. Gittes, Columbus, Ohio, James I. Meyerson, NAACP, New York City, for plaintiff.

James F. Peifer, Springfield, Ohio, for defendant City of Springfield.

Bertram N. Hack, Springfield, Ohio, for defendant Paul R. Collier.

DECISION AND ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT; PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OVERRULED; MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, CITY OF SPRINGFIELD, SUSTAINED; JUDGMENT TO BE ENTERED FOR SAID DEFENDANT UPON FILING OF DEPOSITION OF PLAINTIFF BY THE DEFENDANT, CITY OF SPRINGFIELD; MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, PAUL R. COLLIER, SUSTAINED IN PART AND NOT RULED ON IN PART, PENDING FURTHER BRIEFING BY PARTIES ON IMPACT OF RECENT SUPREME COURT DECISION

RICE, District Judge.

## I.  *Introduction*

This matter is before the Court pursuant to the motions for summary judgment which have been filed by the Defendant, the City of Springfield, Ohio, Doc. # 22, and by the Defendant, Paul Collier, a policeman employed by the City of Springfield. Doc. # 26. In addition, Plaintiff Mark Truss has filed a cross motion for summary judgment against the City of Springfield, requesting that he be granted relief on the basis of the alleged unconstitutionality of the City's fleeing felon policy. Doc. # 29, # 30.

The present action has arisen from events which occurred on March 9, 1977. On that date, Defendant Collier and another Springfield police officer, Charles Schreiber, were dispatched to the Community Motivation Center on South Center Street in Springfield, Ohio, for the purpose of investigating a possible burglary at the Center. When the officers arrived at the Center, Collier entered the building from the back, while Schreiber covered the front entrance. After entering the Center, Collier observed three persons fleeing the scene, and fired at the last individual, the Plaintiff, Mark Truss, as Truss exited through a doorway leading to the front door of the building. Following that incident, Truss filed this action against Collier, seeking to recover for personal injuries he allegedly sustained as a result of the shooting.[1]

---

1. The named City officials were dismissed from this action by order of Judge Rubin on June 13, 1978, based on Plaintiff's failure to submit a response to the motion to dismiss which had been filed by the City officials. *See,* Doc. # 8. In addition, on July 14, 1978, Judge Rubin denied Plaintiff's request for a reconsideration of that order. *See,* Doc. # 16.

On July 14, 1978, Judge Carl Rubin granted permission to Plaintiff to file an amended complaint, but denied leave to amend with respect to those defendants who had been previously dismissed. *See,* footnote 1, *supra.* The first claim for relief in the Amended Complaint seeks recovery against Defendant Collier for shooting Plaintiff in the back of the head as he fled from the Motivation Center on March 9, 1977. Specifically, Plaintiff alleges that Collier's acts were intentional and malicious, and violated constitutional rights granted to Plaintiff by the Eighth and Fourteenth Amendments. In the second claim for relief, Plaintiff alleges that Collier did not have adequate training as a police officer, and that he possessed a reputation for utilizing excessive force in the apprehension of Black suspects. Based on these allegations, Plaintiff requests relief against the City for its failure to properly train Collier, and for its failure to correct his use of excessive force.

On June 5, 1980, this case was transferred to the present Court's docket from that of Judge Rubin. Shortly thereafter, the City of Springfield filed the motion which is currently under consideration. In the memorandum attached to its motion, the City outlines several theories under which it claims to be entitled to judgment as a matter of law. First, the City contends that the Court lacks subject matter jurisdiction under 28 U.S.C. § 1331, and that even if jurisdiction exists under that section, the City cannot be held liable solely because it employed an alleged tortfeasor. Second, the City argues that the Complaint is defective under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (*Monell*) in that it does not allege that the City had a policy or custom of failing to adequately train officers, or of ignoring undesirable traits in its officers. Even if such policies had been alleged, Defendant maintains that Collier did receive appropriate training and did not have a reputation for the use of unwarranted force.

As a further matter, the City notes that while Plaintiff has not alleged that Collier was implementing City policy when he wounded Plaintiff, the discovery process has, in fact, focused to a substantial extent upon Collier's training with respect to when firearms may appropriately be discharged. Consequently, the City has set forth its policies on the permissible use of deadly force to apprehend fleeing felons, misdemeanants, and juveniles, and argues that these policies, which are derived from Ohio common law, do not violate the Constitution. As a final matter, the City requests judgment in its favor on any pendent claims asserted by Plaintiff, in view of the fact that under Ohio law, municipal corporations engaged in governmental functions are immune from liability for the tortious conduct of their employees.

In response to the City's motion for summary judgment, Plaintiff contends that further development of evidence is required in connection with the City's deadly force policies. In the alternative, Plaintiff advances the argument that summary judgment in his favor would be appropriate, given the fact that the City has failed to provide adequate justification for its "rather open ended deadly force policies." Doc. # 25, p. 8. Although Plaintiff does not reply to Defendant's contention that the Complaint is deficient under *Monell,* because it is premised upon vicarious liability, Plaintiff does point out that the involvement of the City's deadly force policies satisfies the *Monell* requirement that municipal liability be predicated on an official policy or custom.[2]

On September 5, 1980, Defendant Paul Collier filed a motion for summary judgment, wherein he maintains that there is no indication in the record that he used excessive force in apprehending Black suspects. *See,* Doc. # 26, p. 1. Moreover, Collier also contends that the materials on file indicate that he acted in good faith and in conformity with applicable police department regu-

---

**2.** The Court agrees with Plaintiff regarding the fact that *Monell* is satisfied by the implication of

the City's policies on deadly force. Consequently, this point will not be addressed further.

lations when he attempted to capture the Plaintiff. Plaintiff did not file a separate response to this motion, but did briefly address Collier's claims in a supplemental memorandum filed both in opposition to the Defendant City's summary judgment motion, and in support of Plaintiff's cross motion for summary judgment. *See,* Doc. # 29, p. 1. Therein, Plaintiff primarily argues that regardless of Collier's reliance upon the City's deadly force policies, issues of fact remain with respect to whether, under the circumstances of the present case, Collier exhausted all reasonable means of apprehension prior to utilizing deadly force. In this document, as well as in Doc. # 30, wherein Plaintiff has formalized his previous request for summary judgment, Plaintiff again urges the Court to rule as a matter of law that the fleeing felon policy followed by the City of Springfield is unconstitutional.

In addressing the matters which have been raised by the parties, the Court will first set forth the relevant facts involved herein, together with the disputed issues of fact, if any. Following that evaluation, the Court will consider the constitutionality of the City of Springfield's deadly force policies, and will then discuss those issues pertaining to the good faith immunity defense of Defendant Collier. With this framework in mind, the Court now turns to consideration of the factual background of the present action.

## II. *Facts*

As was previously noted, the present action arises from a shooting incident which occurred on March 9, 1977 at the Community Motivation Center in Springfield, Ohio. On that date, Plaintiff and two companions, Timothy Hayes and James Jackson, arrived at the Center during the evening. Truss deposition, p. 4.[3] Hayes and Jackson opened the locked back door of the Center

with a crowbar and entered the building. *See, id.* at 10–11. Truss remained outside the building, but later went inside when told to do so by Jackson. *See, id.* at 11–12, and 14. When Truss entered the Center, he observed Hayes at the pool table, breaking open the coin machine apparatus. *See, id.* at 15–16. At some later point, Jackson, who was stationed at the back door of the Center, looking out, informed the others that the police had arrived. Upon being alerted to the presence of the police, Truss began moving toward the front of the Center for the purpose of avoiding arrest. *See, id.* at 19–21.

On the evening of March 9, 1977, the Defendant, Paul Collier, and another police officer, Charles Schreiber, were patroling the southeast corner of the City of Springfield, and at approximately 9:30 p.m., received a report from the dispatcher that a burglary alarm had gone off at the Community Motivation Center on South Center Street. Collier deposition, pp. 30–31 and 43–46. The officers then proceeded to the Center but did not discuss what procedures would be followed once they arrived, other than that Schreiber would take the front entrance, and Collier would take the rear. *See, id.* at 49. *See also,* Schreiber deposition, p. 27. Upon arriving at the Center, Collier, the senior officer, did proceed to the back entrance, and Schreiber covered the front of the building. Collier deposition, pp. 49–50. Both officers were equipped with walkie-talkies, which enabled them to communicate with each other and with the police dispatcher. In addition, the officers carried flashlights and standard issue pistols. *See, id.* at 40, 65–66, and 117. *See also,* Schreiber deposition, pp. 27, and 28–29. The general procedure followed by the Springfield police department in responding to burglaries is that one officer approaches the front of a building, while the other covers the rear entrance.

---

**3.** The Court notes that the deposition of Mark Truss has not been filed with the clerk, as mandated by the Federal Rules of Civil Procedure. The Court has considered the testimony of Truss in ruling upon the pending motions because none of the parties herein have made any objection to the form in which the deposition excerpts have been submitted. However, until such time as Defendants have properly complied with the Federal Rules of Civil Procedure, the Court will not issue a final order in this matter.

If breakage is present, i.e., if the building appears to have been broken into or entered, the officers generally call for assistance, and then, depending upon the circumstances involved, either proceed into the building, or maintain the status quo in the area until help arrives. The individual officers are given discretion with regard to whether they should enter a building or should simply block the exits. Schreiber deposition, pp. 25–26; Collier deposition, pp. 40–43.

When Collier arrived at the rear entrance of the Center, he observed someone inside the back door. Collier did not call for assistance, but instead immediately pulled open the door and yelled, "Freeze, Police." Collier deposition, pp. 67–68, and 90.[4] Collier then ran inside the building, up some steps, and onto a stage which was located in the main room of the Center. *See, id.* at 71–73. Collier indicated that the lighting in the Center was "vague lighting, it was like dusk," but that he was able to observe three suspects running across the floor. *Id.* at 73.[5] According to Collier, the three suspects were running so fast that he couldn't tell whether they were men or women, whether they were juveniles or adults, or whether they were armed. *See, id.* at 74, 92, and 109–110.

Collier stopped on the steps leading down to the stage, drew his service revolver, and fired at the last suspect who was proceeding through the doorway leading to the front entrance of the Center. *See, id.* at 75. At the time Collier fired, the suspect was running through the door with his back toward Collier. *See, id.* at 83. Collier had been instructed to aim for the torso when shooting to stop a suspect, and did, in fact, aim for Truss' torso when he fired. *See, id.* at 20–21, and 75–76. After firing, Collier crouched down, walked over to the front door, and saw blood in the middle of the vestibule. *See, id.* at 76–77, and 86.

During the time that Collier was inside the Center, Schreiber was stationed at the front entrance, waiting. Schreiber deposition, p. 30. The lighting in the front of the building consisted of a small lamp attached to the building and a street light located near the building. *See, id.* at 22. Schreiber heard a shot, and then observed three suspects exiting the building. *See, id.* at 30. Although Schreiber was unable to capture the suspects, he did not fire at them because he knew he was in no danger, and he could tell that they were young. *See, id.* at 30–31.[6] After he heard the shot, Schreiber called the dispatcher for help, stating that shots had been fired. *See, id.* at 28–29. Collier stated that he shot at the suspects because he felt that they constituted a threat to his partner's safety. Collier's reason for feeling the suspects were a threat was that they were running toward Schreiber and he (Collier) did not know whether they were armed. Collier deposition, pp. 92–93, and 116–117. Prior to firing at Truss, Collier did not communicate with his partner, although it would have been possible to do so over the walkie-talkie. *See, id.* at 117. *See also,* Schreiber deposition, pp. 27–28, and 39–40. At some later point, it appears that the suspects

---

**4.** There is a factual dispute with regard to whether Collier gave warning of his presence to the persons inside the building. According to Collier, he yelled "Freeze, Police," almost continuously from the time he entered the Motivation Center. Collier deposition, pp. 68, 70, and 74. The Plaintiff, however, denied hearing any warning or order to stop. Truss deposition, pp. 21–22.

**5.** The precise extent of the lighting in the Center is not clear from the evidence submitted to the Court. Collier indicated that the lighting was like dusk, or between dusk and darkness, with sufficient light to see a silhouette. Collier deposition, pp. 73 and 77. Officer Schreiber testified

that there were some dark areas, i.e., the front hallway, the balcony, the basement, and the part of the stage area on the side away from the steps in the back, but that other than those areas, he could see to walk and could see Collier. Schreiber deposition, p. 35. In addition, Schreiber indicated that the spotlights on the stage were on and that the light in the office may have been on. *See, id.* at 32–33.

**6.** Schreiber apparently stopped two of the suspects, but they escaped while he was distracted by the third, who was going behind a car. When Schreiber turned his attention back to the two who were escaping, the third suspect ran off. *See,* Schreiber deposition, pp. 30–31.

were arrested, although the precise method of apprehension is not disclosed in the record.[7]

Following the above incident, Truss initiated the present action, seeking to recover for injuries sustained as a result of the shooting.

Having thus outlined the factual information pertinent for consideration in connection with the pending matters, the Court will next discuss the constitutionality of the fleeing felon policy followed by the City of Springfield.

### III. *Fleeing Felon Policy*

At the time of the incident in question herein, certain rules and regulations governing the use of deadly force were in effect. These rules, which had been promulgated by the Springfield City Manager and the Chief of Police, provided, with respect to the use of firearms in connection with fleeing felons, as follows:

> Should an officer attempt to effect an arrest of a felon or has reasonable grounds to believe that a certain party has committed a felony, this officer may use his firearm, if such a person cannot feasibly be apprehended by other means.
> 1. Officers must remember that the safety of innocent bystanders should be their primary concern when firing their weapons. Also, these self-same officers are not granted complete immunity in the shooting of or at a felon, because each particular case must be investigated and dealt with based on particular circumstances or situation involved.
> 2. In general, an officer should not shoot a fleeing felon whom he has reasonable grounds to believe is a juvenile. If the escape of such a suspect can reasonably be expected to pose a serious threat to the life of another person or the officer's right of self-defense, then under

these circumstances, the officer may shoot to prevent this person's escape.

Affidavit of Winston Stultz Attached to Defendant City of Springfield's Motion for Summary Judgment, ¶s 14 and 15. In addition, Springfield police officers, including Defendant Collier, were given instruction "consistent with the Ohio Peace Officer's Training Council, Source Document for Police Training promulgated by ... William J. Brown, Attorney General for the State of Ohio." *Id.* at ¶s 16 and 18. That source document states as follows:

> A police officer is justified in killing another person only under the following circumstances:
>
> . . . .
>
> (4) to prevent the escape of a known felon when there is no other way of preventing his escape.
>
> . . . .
>
> (b) A peace officer may legally use deadly force against a known felon to prevent his escape, only when:
>
> The officer has positive knowledge that a crime amounting to a felony has in fact been committed ..., and when the officer knows that the offense committed was in fact a felony and not a mere misdemeanor ..., and when the officer honestly believes that there is no other reasonably apparent method for affecting the arrest or preventing the escape of the felon.

Ex. A attached to Stultz affidavit, pp. 27–29 (citations omitted). The above policies are in accord with the common law of Ohio, which permits the use of deadly force to capture a fleeing felon. *See, e.g., State v. Foster*, 60 Ohio Misc. 46, 60–63, 396 N.E.2d 246, 256–257 (Franklin County C.P., 1979); and *Clark v. Carney*, 71 Ohio App. 14, 15–17, 42 N.E.2d 938, 939–940 (Hamilton County Ct.App., 1942).[8]

---

**7.** The only testimony relating to the apprehension of the suspects was elicited from Collier, who indicated that he had "heard" that the suspects were apprehended, and that it would have been handled through the detective bureau. Collier deposition, p. 115.

**8.** There is some disagreement regarding the relevance of state law for purposes of determining appropriate constitutional standards under 42 U.S.C. § 1983. *Compare, Jacobs v. City of Wichita*, 531 F.Supp. 129, 130–132 & n. 4 (D.Kan. 1982) (holding state law irrelevant); and *Jones v. Marshall*, 528 F.2d 132 (2d Cir.1975) (indicat-

If this Court were free to do so, it would adapt the approach followed by the Eighth Circuit in *Landrum v. Moats,* 576 F.2d 1320 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978) (*Landrum*) and *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976) (*en banc*), *vacated per curiam as advisory opinion sub. nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977) (*Mattis*). In *Mattis,* the Eighth Circuit held Missouri statutes permitting the use of deadly force to effectuate arrest "unconstitutional as applied to arrests in which an officer uses deadly force against a fleeing felon who has not used deadly force in the commission of the felony and whom the officer does not reasonably believe will use deadly force against the officer or others if not immediately apprehended." *Id.* at 1009. After discussing the common and statutory law pertaining to the use of deadly force, as well as scholarly opinion and current police practice, that Court stated:

> The foregoing review clearly establishes that the historical basis for permitting the use of deadly force by law enforcement officers against nonviolent fleeing felons has been substantially eroded, that federal and many state and local law enforcement agencies prohibit the use of deadly force against such felons except where human life is threatened, and that the policy of permitting deadly force to

be used against all fleeing felons contributes little or nothing to public safety or the deterrence of crime.

*Id.* at 1016 (footnote omitted).

As was previously indicated, the Supreme Court vacated the Eighth Circuit's opinion as an advisory one, based on the fact that, in the higher Court's view, the only remaining interest in the case appeared to be that premised upon the appellee's claim that "he will obtain emotional satisfaction from a ruling that his son's death was wrongful." 431 U.S. at 172, 97 S.Ct. at 1740. This, the Court found insufficient to satisfy the requirement of a live "case-or-controversy." *Id.*

In a subsequently-issued decision, the Eighth Circuit noted that the Supreme Court's ruling in *Mattis* had rendered that opinion "no longer ... binding precedent." *Landrum, supra,* 576 F.2d at 1324. In *Landrum,* the facts were virtually identical to those in the previous Eighth Circuit case, but the state statutes governing the use of deadly force differed substantially. Because the Nebraska statutes involved in *Landrum* followed the model Penal Code approach of making "the use of deadly force against fleeing felons unreasonable per se," there was no need for the *Landrum* Court to specifically address those issues litigated in *Mattis. Id.* at 1326, and 1327, n. 13.[9] However, while discussing

---

ing that courts need not "'tie section 1983 to the technicalities of state law,'" ... "some room must be left to the individual states to place a higher value on ... peace, order, and vigorous law enforcement, than on the rights of individuals reasonably suspected to have engaged in the commission of a serious crime." *Id.* at 142 (citation omitted). *See also, Wiley v. Memphis Police Dep't,* 548 F.2d 1247 (6th Cir.), *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977) [rejecting attack on the constitutionality of the Tennessee fleeing felon policy based on the fact that a re-examination of such "'is a policy decision for the Tennessee Legislature or perhaps the Tennessee courts and not for federal courts in the guise of constitutional adjudication.'" *Id.* at 1250, quoting from *Cunningham v. Ellington,* 323 F.Supp. 1072, 1075 (W.D.Tenn. 1971)]. This Court expresses no view on this matter, beyond noting that even in *Jones v. Marshall,* the Court observed that "[i]n an unbroken line of Supreme Court cases ..., the

conduct of police officers has, ... been held subject to standards demanded by the Constitution of the United States, regardless of approbation by state law." 528 F.2d at 137 (citations omitted). *Accord, Landrum v. Moats,* 576 F.2d 1320, 1328, n. 15 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978). In any event, this Court has not cited state law as the required constitutional standard, but instead has simply noted, in passing, that the policy of the City of Springfield and that mandated under the common law appear to be one and the same.

**9.** Thus, the *Landrum* Court distinguished *Mattis* as follows:

> The holding of *Mattis II* on the merits was that statutes that authorize police officers to use deadly force against fleeing nonviolent felons are unreasonable per se and thus unconstitutional. As such, it is not implicated by this case, which is a challenge to the reasonableness of individual police action rather

whether assumption of jurisdiction over the plaintiff's § 1983 claim would be warranted, the *Landrum* Court observed that:

> Prior to its holding on the merits, the Court [in *Mattis*] assumed jurisdiction by first declaring that *an individual has a fundamental right to life, and then finding that right protected against unreasonable or unlawful taking by the procedural due process safeguards of the fifth and fourteenth amendments.*

*Id.* at 1324 (citation omitted) (parenthetical material and emphasis added). The Court in *Landrum* then specifically readopted the above jurisdictional holding of *Mattis*. *Id.*

Subsequent to the above decisions in *Landrum* and *Mattis*, there has been no activity of note in the Eighth Circuit on this issue.[10] In the Tenth Circuit, however, the reasoning of *Mattis* was applied in *Jacobs v. City of Wichita*, 531 F.Supp. 129 (D.Kan. 1982). In that case, based on its belief that state law was irrelevant for purposes of determining the pertinent constitutional issues, the Court did not hold the state statute unconstitutional. *See, id.* at 132 & n. 4. The Court did indicate that the jury would be instructed in accord with its opinion, which expressly rejected the privilege, granted under state law, of employing deadly force against all fleeing felons, regardless of the nature of their crimes. *See, id.* at 130. Specifically, the Court stated:

> What is wrong with such a rule should be obvious .... when the state kills a

fleeing felon, it has taken from him the supreme, fundamental right.... The only state interest that could possibly be sufficiently compelled to justify the killing of a felony suspect without any process at all would be the state's interest in protecting its police, and the public at large, from death or bodily injury; yet a rule of privilege that allows the killing of a nonviolent, unarmed burglary suspect is not narrow enough to express only this interest.

*Id.* at 132. The Court then commented:

> Moreover, the overwhelming weight of scholarly opinion and the clear trend in the policies of police departments nationwide ... suggest that *policies which permit the use of deadly force against nonviolent felony suspects will soon be consigned to the historical scrap heap as inconsistent with the evolving standards of a maturing society.*

*Id.*

As was previously indicated, this Court would, if permitted, adopt the position taken by the above courts, and would, accordingly, discard this anachronistic rule which now enjoys neither a logical nor practical foundation. However, in assessing the issues involved herein, this Court is required to follow the initial panel decisions rendered upon this subject, as are subsequent panels of the Sixth Circuit, until such time as that Court sitting *en banc* overrules its prior decisions. *See, Timmreck v. United States*, 577 F.2d 372, 376, n. 15 (6th Cir. 1978), *rev'd on other grounds*, 441 U.S.

---

than to a legislative grant of power to use deadly force under the circumstances.
576 F.2d at 1325, n. 6.

**10.** It will be apparent, from later discussion in the main text, that this Court is precluded, under binding Sixth Circuit authority, from adopting the approach followed in the *Mattis* decision. For this reason, it is not essential to determine whether, and to what extent, the *Mattis* holding retains viability. The Eighth Circuit has not commented upon *Mattis* other than in the manner noted in the main test. It is worth observing, however, that the opportunity for such discussion may have been hampered by certain enactments of the Missouri legislature. Specifically, it appears that Missouri in 1977 promulgated a new statute governing the use of

deadly force by law enforcement officers when effectuating arrest. *See*, Mo.Ann.Stat. § 563.046 (West.Supp.1983). An analysis of this statute reveals that while certain restrictions have been placed upon the use of deadly force, such use against a nonviolent felon would still appear to be permissible. Because this statute did not become effective until 1979, litigation, if any, arising from the use of deadly force in the latter circumstance may not yet be procedurally ready for a ruling on the statute's constitutionality. In any event, given the required holding herein, it is unnecessary for this Court to speculate either about the present effect of *Mattis*, or about the future status of the Missouri statute on deadly force.

780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). In this context, the Sixth Circuit has spoken definitively on the issue of the constitutionality of the fleeing felon rule. This matter was initially addressed by a three-judge panel at the district court level in *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971) (*Cunningham*). In *Cunningham,* the plaintiff's decedent was shot and killed by police officers as he attempted to evade arrest. *See, id.* at 1073–1074. At that time, the applicable Tennessee law permitted the use of deadly force against a fleeing felon regardless of the nature of his crime, and despite the fact that the circumstances surrounding the crime did not threaten the lives or safety of others. *See, id.* at 1074–1075.[11] Subsequent to the filing of the action, a three-judge panel was convened "to hear and determine ... the question of the facial constitutionality of the ... [fleeing felon] statute." *Id.* at 1074.

In support of their challenge to the constitutionality of the statute, the plaintiffs presented four contentions: (1) that "in authorizing the use of force that may kill a person, the statute authorizes cruel and inhuman punishment [in violation of the Eighth Amendment]; " (2) that the statute was constitutionally overbroad insofar as its permitted use of deadly force intruded upon the right to jury trial, the right to confrontation of witnesses and the like; (3) that the statute was impermissibly vague, in violation of the Fourteenth Amendment due process requirement; and (4) that the statute violated the Equal Protection Clause by allowing the use of deadly force against fleeing felons but not against fleeing misdemeanants, even though certain

felonies were crimes of less seriousness than a misdemeanor. *See, id.* at 1075–1076. The three-judge panel, in an opinion written by Judge Bailey Brown (now a Senior Circuit Judge), rejected each of these challenges, and held the fleeing felon statute constitutional on its face. *See, id.* at 1076.

In response to the Eighth Amendment challenge, the Court concluded that the use of deadly force did not constitute punishment. *See, id.* at 1075. In addition, the Court found that while "[i]t may ... as a matter of value judgment ... be better to allow persons thought to be felons to escape than to incur the risk of killing them," such a determination would be "a policy question for the Tennessee legislature or perhaps the Tennessee courts and not for the federal courts in the guise of constitutional adjudication." *Id.* Moreover, the Court viewed and rejected the overbreadth challenge as one also based on "the argument that the force exercised by the arresting officer is punishment, and so viewed, *any* exercise of force by an officer to effect an arrest for *any* offense ... would be denial of such rights." *Id.* (emphasis in the original). With respect to the due process argument, the Court concluded that although officers were given a great deal of discretion under the statute, the standard of conduct was "not so vague as to require an officer to guess as to its meaning." *Id.* at 1076. Finally, based on the Supreme Court decision in *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Court in *Cunningham* determined that the Tennessee statute did not impermissibly distinguish between types of criminal activity. 323 F.Supp. at 1076.[12]

---

**11.** The Tennessee statute involved in *Cunningham* merely codified the common law, and contained provisions similar to the Springfield City policy in effect herein, as well as to the Ohio common law. *See,* 323 F.Supp. at 1074–1075.

**12.** The Court in *Cunningham* noted that the Supreme Court in *Skinner v. Oklahoma,* had held as follows:

"Thus, if we had here only a question as to a State's classification of crimes, ... no substantial federal question would be raised.... For a State is not constrained in the exercise

of the police power to ignore experience which marks a class of offenders or a family of offenses for special treatment."

*Id.* at 1076, quoting from 316 U.S. at 540, 62 S.Ct. at 1112. The District Court then observed that "[t]he real basis for the opinion in *Skinner,* ... is that the sterilization statute treated persons who had committed substantially the same crime differently." *Id.* Thus, the *Cunningham* Court had no difficulty with the fact that deadly force could be employed even where the felony

The *Cunningham* decision was apparently never appealed, and the next comment on the fleeing felon rule occurred in *Beech v. Melancon,* 465 F.2d 425 (6th Cir. 1972) *(per curiam ), cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973). In that case, the plaintiff was shot by police officers while he was fleeing from the scene of a burglary. *See, id.* at 426.[13] On appeal, the Sixth Circuit noted that: "[t]he single issue here presented is whether the trial court was guilty of clear error in concluding that the defendants were justified in the use of deadly force to apprehend the plaintiff." *Id.* With respect to this issue, the Court concluded that: "[a] Tennessee statute ... authorizes a police officer under the circumstances set forth above to '... use all the necessary means to effect the arrest.' *This statute has been recently construed and found to be constitutional by a Three-Judge District Court." Id.* (emphasis added). In addition, the Court also determined that the officers were entitled to rely on the presumptive constitutionality of the statute. Judge McCree, in a concurring opinion, agreed that the officers employed an appropriate amount of force, but indicated that he did not "find it necessary to reach the question whether the Tennessee statute under the authority of which the officers acted is constitutional." *Id.*

In *Qualls v. Parrish,* 534 F.2d 690 (6th Cir.1976), the Sixth Circuit again discussed the fleeing felon rule. In that decision, the Sixth Circuit noted that:

> The district court ... determined that the Sheriff of Decatur County ... did not violate plaintiffs' civil rights when, after a high-speed automobile chase, one of the deputies shot at plaintiff Bunch's automobile and killed Trull, plaintiff Quall's decedent. The district court, on alternative grounds, determined that defendants lawfully employed deadly force in order to apprehend plaintiffs.

*Id.* at 691. Judge McCree, who had authored the concurring opinion in *Beech v. Melancon,* made the following observation with regard to the determination of what law of privilege should govern the use of deadly force.

> We begin our analysis by observing that federal, not state, law applies and determines the adequacy of defenses asserted in a civil rights action.... Accordingly, although we are not bound by a state law privilege available to a police officer, nevertheless, ... "[W]e still are by no means free to elevate whatever view of the privilege we think to be preferable to the constitutional level envisaged by § 1983." ... If we were writing on a blank slate, we would adopt the rule that Judge Oakes proposed in *[Jones v. Marshall ]....* It would limit the privilege [of police use of deadly force] to the situation where the crime involved causes or threatens death or serious bodily harm, or where there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed."

*Id.* at 194, quoting from *Jones v. Marshall,* 528 F.2d 132, 138 (2d Cir.1975).

Despite this fact, however, the Court concluded that the state law applicable in deadly force situations would be utilized. *See,* 534 F.2d at 194. Specifically, the Court commented that to hold otherwise would penalize an officer who had relied on such a law. *See, id.* In addition, the Court noted that the common law rule permitting the use of deadly force to capture a fleeing felon had been followed by "[m]ost of the state courts that have considered this question." *Id.*

The next treatment of this issue occurred in *Wiley v. Memphis Police Department,* 548 F.2d 1247 (6th Cir.), *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977) *(Wiley ).* In *Wiley,* the plaintiff brought a wrongful death action against, *inter alia,*

---

involved might be less dangerous than a misdemeanor.

**13.** There is no indication that the felons in the cited case had employed any force during their attempted robbery of a gas station safe. *See,* 465 F.2d at 426.

the City of Memphis and certain city police officers, based on the shooting and killing of her son, a teenager, as he fled after having burglarized a sporting goods store. A verdict for the defendants was rendered after a non-jury trial, and the plaintiffs then appealed to the Sixth Circuit. *See, id.* at 1248. On appeal, the Sixth Circuit noted that:

*Plaintiff challenged the deadly force policy of the City of Memphis and the Memphis Police Department,* (MPD), which policy authorized police officers to use deadly force whenever they deemed it necessary to effect the arrest of a felon. *Plaintiff claimed that such policy was a violation of the constitutional rights of her decedent.* The defense was that such policy was specifically authorized by and conformed to Tenn.Code Ann. § 40–808, which provides:

Resistance to Officer—If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest.

*Id.* at 1248.

In *Wiley,* the Court of Appeals clearly rejected the challenge to the constitutionality of the fleeing felon statute. Judge Weick, writing for the majority, first stated:

In a real sense, this Court is being called upon by plaintiff to rule the allowable Tennessee law procedures, ... to be declared unconstitutional in the face of a three judge court's contrary determination less than a year before this episode. This court agrees with the opinion there expressed, ... that "this is a policy decision for the Tennessee Legislature or perhaps the Tennessee courts and not for federal courts in the guise of constitutional adjudication."

*Id.* at 1250, quoting from *Cunningham, supra,* 323 F.Supp. 1072, 1075 (W.D.Tenn. 1971).

Judge Weick further noted that the constitutionality of the Tennessee fleeing felon rule had been upheld in the *Cunningham* case in the face of a variety of constitution-al challenges. *See, id.* at 1250–1251. Moreover, Weick stated:

We considered the constitutionality of T.C.A. § 40–808 in another case, *Beech v. Melancon*....

In finding that the District Judge had evidence to justify his finding that the "officers used only the necessary means to effect the arrest," this Court, with Judge McCree concurring in the result, followed *Cunningham v. Ellington, supra,* in upholding the constitutionality of the statute.

*Id.* at 1251.

Later in its opinion, the Court pointedly criticized the Eighth Circuit decision in *Mattis,* by commenting as follows:

The Eighth Circuit is the only Court to our knowledge which has ever held that such a statute, which is so necessary even to elementary law enforcement, is unconstitutional. It extends to the felon unwarranted protection, at the expense of the unprotected public.

We agree with the dissent in the Eighth Circuit case (*Mattis v. Schnarr*), which was highly critical of the majority opinion for not following the decisions of other Circuits and for embarking on a new course which should have been left to the state legislatures where it belongs.

*Id.* at 1252.

Finally, Judge Weick observed that:

The majority opinion of the Eighth Circuit in *Mattis* does not suggest how law enforcement officers are to make the on-the-spot constitutional analysis called for by its proposal and still react quickly enough to meet the exigencies of an emergency situation. How can a police officer ever know, reasonably or otherwise, whether the felon will use force against others if he is not immediately apprehended? It is clearly the prerogative of the state legislature to decide whether such restrictions on the use of such force are consonant with public policy.

*Id.* at 1253. Judge McCree again concurred only in the result in the case, be-

cause he did not consider that the appeal required the Court "to decide whether the rule that permits a police officer to use deadly force to apprehend a fleeing felon when there is no threat to human life is constitutional." *Id.* at 1256.

Given the above decisions by the Sixth Circuit, it would be unwarranted, as well as an abuse of the applicable authority, for this Court to conclude that the City of Springfield fleeing felon policy is unconstitutional. This is so, despite indications in later Sixth Circuit decisions that other panels of the Court might prefer a different result. *See, Garner v. Memphis Police Department,* 600 F.2d 52, 54–55 (6th Cir. 1979) (*Garner*), and *Haislah v. Walton,* 676 F.2d 208, 214, n. 3, and 215 n. 4 (6th Cir.1982). In *Garner,* Judge Merritt, writing for the Court, distinguished the previous Sixth Circuit decisions as follows:

> Our previous decisions do not establish the constitutionality of Tenn.Code Ann. § 40–808, permitting a city to authorize its officers to use deadly force against a fleeing felon.... Although there is discussion of the constitutionality of the Tennessee statute in the *Beech, Qualls* and *Wiley* cases, *supra,* all three of those cases dealt with actions against individual officers under § 1983, and not liability based on the "policy or custom" of a governmental entity.

600 F.2d at 54. Accordingly, the Court remanded the case against the City for further consideration by the District Court of several issues, including whether "a municipality's use of deadly force under Tennessee law to capture allegedly nondangerous felons fleeing from nonviolent crimes [is] constitutionally permissible under the fourth, sixth, eighth and fourteenth amendments." *Id.* at 55 (footnote omitted). In *Haislah v. Walton,* the fleeing felon rule was not in issue, but the Court, in a footnote, did refer to several decisions on the

subject, including, *inter alia, Garner* and *Mattis. See,* 676 F.2d at 215, n. 4.

■ ·However much this Court might wish to interpret the relevant Sixth Circuit decisions in the manner suggested in *Garner,* such a conclusion would be impermissible, particularly with regard to the *Wiley* decision.[14] As was previously noted, the plaintiff in *Wiley* did name the governmental entities such as the city and the police department as defendants, and did directly "challenge the deadly force policy of the City of Memphis, ... [claiming] that such policy was a violation of the constitutional rights of her decedent." *Wiley, supra,* 548 F.2d at 1248. Thus, it is impossible to conclude that the Sixth Circuit has not spoken on the issue of the constitutionality of the fleeing felon rule. Consequently, until such time as the Sixth Circuit sitting *en banc* overrules or discards the precedent in *Wiley,* this Court is bound to follow that decision. Accordingly, this Court must conclude, albeit with great reluctance, that the fleeing felon policy promulgated by the City of Springfield did not violate the constitutional rights of the Plaintiff, Mark Truss. Having reached this somewhat distressing, but necessary conclusion regarding the constitutionality of the fleeing felon rule, the Court will next consider the qualified immunity defense of the Defendant, Paul Collier.

### IV. *Qualified Immunity*

As was previously indicated, Defendant Collier contends that summary judgment may appropriately be granted in his favor, based: (1) on the fact that there is no evidence in the record to indicate that he used or possessed a reputation for using excessive force in the apprehension of Black suspects, and (2) on the fact that he acted in good faith and in compliance with applicable police department regulations when he attempted to arrest Truss. In response to this latter contention, Plaintiff

---

**14.** It is worth observing that of the panel members involved in *Garner,* none had participated in the decision in *Wiley.* Judge Edwards, however, had been a member of the panel in *Qualls v. Parrish,* and in *Beech.* In addition, Judge Lively took part in the decision in *Qualls v. Parrish. Compare, Garner,* 600 F.2d at 53; *Wiley,* 548 F.2d at 1248; *Qualls v. Parrish,* 534 F.2d at 691; and *Beech,* 465 F.2d at 426.

claims that regardless of Collier's reliance upon City policy, issues of fact remain with respect to whether Collier exhausted all reasonable means of apprehension prior to utilizing deadly force.

■ It has long been established that police officers are entitled to assert a defense of good faith immunity in actions brought for damages under 42 U.S.C. § 1983. *See, Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Scheuer v. Rhodes*, 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1691–1692, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 321–322, 95 S.Ct. 992, 1000, 1001, 43 L.Ed.2d 214 (1975); *Glasson v. City of Louisville*, 518 F.2d 899, 907–910 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). However, subsequent to the submission of the motion presently under consideration, the Supreme Court substantially altered the standard to be applied in determining good faith immunity. In *Harlow v. Fitzgerald*, 457, U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (*Harlow*), the Supreme Court expressed concern over the social costs of suits against public officials. *See, id.* 102 S.Ct. at 2736. The Court noted that previous decisions "have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The objective element involves a presumptive knowledge of and respect for 'basic unquestioned constitutional rights.... The subjective component refers to 'permissible intentions.'" *Id.* 102 S.Ct. at 2737 (citation omitted). The Court then observed that "[t]he subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial." *Id.* Accordingly, the Supreme Court eliminated the subjective component and stated as follows:

> [B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery.

We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* 102 S.Ct. at 2738. Thus, the Court directed lower courts as follows:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Id.* 102 S.Ct. at 2739 (footnotes omitted).

■ Given this Court's previous conclusion regarding the fleeing felon rule, it is apparent that Collier's conduct must be evaluated in the context of the clearly established law in effect at the time of the shooting incident, that is, in light of the Springfield City policies regulating the use of deadly force.[15] Moreover, in view of the Sixth Circuit's previous interpretation of the objective portion of the immunity standard, it appears that summary judgment in Defendant Collier's favor may well be warranted. Specifically, in *Wolfel v. Sanborn*, 555 F.2d 583 (6th Cir.1977), the Sixth Circuit stated that "[t]he second consideration under *Wood*, the objective prong of the test, is whether the defendants acted 'with such disregard of the [plaintiff's] clearly established constitutional rights that their action cannot reasonably be characterized

---

**15.** It should be noted that in *Harlow*, the Supreme Court expressly indicated that the immunity standard adopted therein should be applied in actions brought against state as well as federal officials. *See, id.* 102 S.Ct. at 2738–2739, n. 30. Thus, it makes no difference that Collier was acting under color of state, rather than federal law.

as being in good faith.'" *Id.* at 592, quoting from *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975).[16] Based on the undisputed facts herein, and after construing all inferences in the evidence most strongly in Plaintiff's favor, *McHenry v. Ford Motor Co.,* 269 F.2d 18, 22 (6th Cir.1959), it does not appear that Defendant Collier acted with such disregard for the Plaintiff's rights that his actions cannot reasonably be considered to have been in good faith. Given the fact situation in the instant case, of course, the converse is true and the above quoted language from *Harlow* is not strictly applicable. Herein the fleeing felon rule was clearly established law, in effect at the time of the shooting incident, and has been declared to be constitutional. Therefore, since the Defendant acted in conformity with that law, it cannot be said that he acted with such disregard for the Plaintiff's rights that his actions cannot reasonably be considered to have been in good faith. Therefore, he might well be entitled to claim the good faith immunity defense. Without repeating the entirety of the preceding discussion, the Court notes that Collier had been taught to assume that any suspect is potentially dangerous, and that burglaries in progress are also potentially dangerous. *See,* Collier deposition, pp. 37 and 64. In addition, Collier indicated that he assumed the suspects were armed. *See, id.* at 92.[17] As was previously indicated, the lighting in the Center was like dusk, and Collier shot at the suspects because he felt there was no other possible means of apprehending them, and because he feared for his partner's safety. *See, id.* at 73, 91–92, and 114. Under these circumstances, the Court cannot say that Collier acted with such disregard for Plaintiff's rights as to render his actions unreasonable and, therefore, not in good faith. This is particularly evident when Collier's actions are viewed not with hindsight, but in accordance with the maxim that "'police officers ... must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office.'" *Standridge v. City of Seaside,* 545 F.Supp. 1195, 1199 (N.D.Cal.1982), quoting from *Scheuer v. Rhodes,* 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974).

Thus, in view of the Sixth Circuit authority interpreting the objective portion of the immunity standard prior to *Harlow,* it appears that summary judgment in favor of Defendant Collier may well be mandated. However, because the parties herein have been provided with no opportunity to brief the impact of the *Harlow* decision, the Court will defer a ruling on the motion for summary judgment submitted by Collier until such time as Plaintiff, particularly, has been permitted to attempt to convince the Court either that its interpretation of the pre-*Harlow* authority is incorrect, or that under the facts of this case, Defendant Collier did act with such disregard for Truss' constitutional rights as to preclude summary judgment on the issue of Collier's good faith immunity.

> *Wolfel v. Sanborn* applied the discarded portion of the standard in concluding that a "jury could reasonably find that ... [the defendants] acted in other than subjective good faith," 666 F.2d at 1007, remand of the case was both entirely appropriate, and of no relevance to previous interpretations of objective good faith.

16. It should be noted that a subsequent Sixth Circuit decision in *Wolfel v. Sanborn* was vacated by the Supreme Court and remanded for further consideration in light of the *Harlow* case. *See, Wolfel v. Sanborn,* 666 F.2d 1005 (6th Cir.), *vacated and remanded,* 458 U.S. 1102, 102 S.Ct. 3476, 73 L.Ed.2d 1363 (1982). On remand, the Sixth Circuit concluded that it would be appropriate to remand the case to the district court for reconsideration under *Harlow. See, Wolfel v. Sanborn,* 691 F.2d 270 (6th Cir.1982). An examination of the opinions in the above case does not indicate that any doubt has been cast upon the Sixth Circuit's prior interpretation of the objective portion of the immunity test. This is so because the *Harlow* decision affected only the subjective aspect of that standard. Thus, given the fact that the Sixth Circuit in

17. The testimony of Springfield Police Sergeant Max Day reflects a similar understanding of the dangerous nature of burglaries. Specifically, Day indicated that robberies and burglaries were assumed to be potentially dangerous, and that the officer normally should assume that the suspects involved in those situations were armed. *See,* Day deposition, pp. 26–28.

■ With regard to allegations in the Complaint concerning Collier's alleged use of, and reputation for using excessive force on Black suspects, the Court notes that there is presently no evidence in the record to indicate that Collier used, or had a reputation for using such excessive force. In fact, the undisputed evidence indicates that Collier had never been charged either with brutality or with any type of misconduct. *See,* Collier deposition, pp. 97–98, and affidavit of Winston Stultz, ¶s 4, 9, and 10. Consequently, summary judgment in Collier's favor on *this* point is appropriate, and will be ordered, even should the Court subsequently alter its opinion regarding the effect of recent changes in the law of qualified immunity.

## V. *Conclusion*

Based on the preceding analysis, the Court concludes as follows:

1. The deadly force policies of the City of Springfield were not violative of Plaintiff Mark Truss' constitutional rights. Accordingly, the motion of the Defendant, the City of Springfield, Ohio, is hereby granted. Judgment will, accordingly, be entered in favor of the Defendant, the City of Springfield, Ohio, and against the Plaintiff herein, upon the filing of the Plaintiff's deposition by the Defendant, City of Springfield. Having found in favor of the constitutionality of these policies, it logically follows that the Plaintiff's motion for summary judgment, upon the ground of the alleged unconstitutionality of same, must be, and hereby is, overruled;

2. The motion for summary judgment filed by Defendant Paul Collier is granted in part, with respect to the allegations herein that Collier used or possessed a reputation for using excessive force against Black suspects. With regard to Collier's good faith immunity, the parties are directed to submit briefs within fourteen days of receipt of this decision, addressing those issues raised in part IV of this opinion.